[Crim. No. 21847. Second Dist., Div. Five. June 1, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
RUSSELL A. KAGELER, Defendant and Appellant.

## Counsel

Richard H. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Howard J. Schwab and Donald F. Roeschke, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**KEENE, J.***—In a one count information the defendant was charged with grand theft in violation of section 487, subdivision 1, of the Penal Code; a jury convicted him. The trial was preceded by a motion to dismiss pursuant to section 995 of the Penal Code and followed by a motion for a new trial pursuant to section 1181 of the Penal Code—they were both denied. Following a 90-day commitment to the Department of Corrections and the obtaining of a diagnostic report (§ 1203.03, Pen. Code) the defendant was granted formal probation for a period of five years predicated upon the suspension of the proceedings. One of the conditions of probation was that the defendant spend the first year in the county jail. He now appeals, contending that he is entitled to a reversal on one, or all, of the following grounds:

1. Under the "best evidence rule" the trial court erroneously permitted the People to play a copy of the tape recording of a conversation the police had with appellant;

2. The trial court should have instructed the jury on its own motion as to the law of accomplices;

3. The trial court erroneously failed to answer a question of the jury;

4. The trial court should have instructed the jury that the nonexistence of Transamerica Mining Corporation and Robert J. Black had not been established and that evidence in this regard should be viewed with caution;

5. Because the defense obtained new evidence pertaining to Black and the Transamerica Mining Corporation, the trial court erroneously denied appellant's motion for a new trial.

Our analysis of the defendant's contentions in the context of the factual

---

*Assigned by the Chairman of the Judicial Council.

situation giving rise to his conviction leads us to the conclusion that they are void of merit, individually and collectively, and accordingly we affirm the judgment of conviction.

This "Love Story" began on June 3, 1970, at the Cedars of Lebanon Hospital when Aurora Eslava met the defendant; she was a nurse and he was a patient. Six days later she moved into his apartment. The defendant's talk of affection and marriage continued unabated after the common law joinder, but soon thereafter a new topic of conversation was added: the finances of Aurora's 70-year-old mother, Teresa, and her 70-year-old father, Isabelo.

It seems that Isabelo Eslava had recently received $7,000 in an accident settlement and that he and his wife wanted to bring this and their life savings to California from Connecticut where they were then residing. Aurora went east to help them drive across the country. While there she called the defendant and sought his transcontinental financial advice as to whether or not her elderly parents should drive across the country with their money and some bonds which they owned. The advice which, unfortunately, was heeded, was to send everything to the defendant by registered mail. A savings passbook for an account showing a balance of $14,510.68 and the bonds were sent to the defendant.

When the elderly Eslavas arrived in California, they were induced by the defendant, using Aurora as an apparently love sick and unsuspecting agent, to put $10,000 in a bank account in the names of defendant and Aurora "in trust" for Teresa Eslava, and $4,510.68 in another bank account in the name of the defendant alone. The inducement to set up the first account was to have a "younger" person's name on the account so that the state would not claim it if anything should happen to the older person; the inducement for the second was to permit defendant to invest the money for the Eslavas as well as giving them easy access to cash without the necessity of withdrawing from the $10,000 account—for which the defendant obviously had other plans.

All this time the elder Eslavas were under the impression that their daughter and defendant were man and wife and, indeed, he had given her a ring ("charged") to prove it. The "marriage" lasted about as long as the money did, from June to November.

In August of 1970 the defendant withdrew $2,800 from the smaller account and invested it in mutual fund stock, which he put in his name. The proffered explanation to the Eslavas was that this would facilitate further buying and selling. In September the defendant obtained a $1,000 personal loan, using the mutual fund stock as security. In November the

defendant withdrew the entire $10,000 from the account ($1,500 in cash and $8,500 in a cashier's check), forfeiting all interest and giving the questioning bank the false reason that it was needed for medical purposes. A letter to this effect was dictated by the defendant, typed by Aurora, and signed by Eslava, who did not read the contents.

The defendant took the money and went to Texas, purportedly to invest in "Transamerica Mining," which the defendant contends was a subsidiary company of "Transamerica Corporation." This transaction, according to the defendant, was consummated with one Robert J. Black, whom the defendant met either in California or Mexico—depending upon which version, if any, is to be believed. The defendant received two stock certificates for 2,500 shares each, at least this is what "he believes." We need not detail here the many explanations which the defendant gave from the witness stand, as ingenious and circuitous as they were; they would unnecessarily burden this opinion. But certainly of interest to the trier of fact was the defendant's testimony that these stock certificates were made out in his name, paid for with the Eslava's $10,000 in an initial deposit of $1,500 cash "front money to show my good faith . . . almost immediately when I got off the plane." He received no receipt for the initial payment but paid an "additional $7000 balance" the following day which then went into a joint bank account for Mr. Black and the defendant. It need hardly be added, but the stock certificates were left with the peripatetic Mr. Black, none of which, or whom—the two stock certificates or Mr. Black—appeared at the trial.

Also while in Texas the defendant ordered by telephone the sale of a large portion of the mutual fund stock for which he personally received $1,300. His implausible explanation for this to the now doubting, albeit tardy, Aurora was that he wanted to see if the sale of the stock was possible.

It will come as no surprise to the reader that the elder Eslavas never got any of their money back, realized no profit from their "son-in-law's" stock transactions—let alone ever saw the stock. In all fairness, however, it should be stated that he did return to the Eslavas their bonds—upon the suggestion of the investigating officer just days before his arrest.

The defense was one of a completely misunderstood series of financial transactions by a philanthropic would be son-in-law who was only interested in improving the financial lot of the Eslavas and in ultimately marrying their daughter. ("I told her that when I went back to work and we were financially set, we could probably make it to Vegas.")

## The Tape Recording

The investigating officer recorded a conversation he had with the defendant and, in rebuttal, a portion of it was played to the jury. This was done by the use of a copy of the original tape recording and it was also done over the objection of the defendant. Here is the portion of the conversation that was played to the jury:

"Q How did you meet him in the first place?

"A I met him while I was on vacation.

"Q Where?

"A In Mexico.

". . . . . . . . . . . . . . . . .

"Q Do you have any business cards or anything that further indentifies him as to his account in Transamerica?

"A No, sir, I don't.

"Q How did you meet him in the first place?

"A I met him while I was on vacation.

"Q Where?

"A In Mexico.

"Q That when you went to Guadalajara?

"A Right.

"Why did you go to Guadalajara in the first place?

"A I went to Guadalajara in the first place really, to be honest, Mr. Hambly, I had had a head injury, and I couldn't work—they wouldn't let me go back to work, so I went on—"

The record is not clear as to why a rerecording was played instead of the recording itself; however, it is of no moment as both the original and "copy" were in the court room and available for inspection by the defendant. It was admissible; there was no error. It is contended that this admission into evidence violated the best evidence rule; this is simply not so, as three sections of the Evidence Code clearly demonstrate. They are sections 1500, 1510, and 250, and they provide in that order: "Except as otherwise provided by statute, no evidence other than the writing itself is admissible to prove the content of a writing. This section shall be known and may be cited as the best evidence rule."

"A copy of a writing is not made inadmissible by the best evidence rule if the writing has been produced at the hearing and made available for inspection by the adverse party."

" 'Writing' means handwriting, typewriting, printing, photostating, photographing, and every other means of recording upon any tangible thing any form of communication or representation, including letters, words, pictures, sounds, or symbols, or combinations thereof."

## THE ACCOMPLICE INSTRUCTIONS

"An accomplice is one who is liable to be prosecuted for the identical offense charged against the defendant on trial.

"To be an accomplice, the person must have knowingly and with criminal intent aided, promoted, encouraged, or instigated by act or advice, or by act and advice, the commission of such offense." (CALJIC No. 3.10.)

"A conviction can not be had upon the testimony of an accomplice unless it is corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense." (CALJIC No. 3.11.)

■ The second contention of error of the defendant is predicated upon the failure of the trial judge to give these two jury instructions *sua sponte*. While it is quite clear that under certain circumstances these two instructions do fall within the *sua sponte* instructional obligation of the trial judge, *People* v. *Bevins,* 54 Cal.2d 71 [4 Cal.Rptr. 504, 351 P.2d 776], it is equally clear that the obligation does not arise in the absence of some evidence of a person, or persons, being an accomplice. The absence could not be more manifest than it is here. Inherent in the crime of theft, grand or otherwise, is the specific intent to deprive the owner permanently of his property. (*People* v. *Jaso,* 4 Cal.App.3d 767 [84 Cal.Rptr. 567].) While a search of the record may well disclose that Aurora Eslava is "guilty" of many things, it clearly does not disclose any evidence to warrant any inference that she intended to permanently deprive her parents of their property. Her testimony was clear:

"Q From the time you first met Mr. Kageler until the present time have you ever authorized him to use any of those monies for his own purposes?

"A No.

"Q To your knowledge was he spending all this money for the benefit of your parents?

"A All of it?

"Q Yes.

"A Yes.

"Q Were there some exceptions of small amounts of money?

"A If I recall, yes.

"Q What were those exceptions?

"A He had bought some clothes when he was going down to Mexico. I believe he had a dentist bill that he had to pay.

"Q Those were authorized?

"A Not really. I—when he was buying the clothes, I mentioned it to him, 'Why are you doing this?' And he says, 'Well, I'll pay you back.'

"Q To your knowledge have your parents received any of the $14,510.68 or any of these stocks or the benefits from it?

"A No."

■ The test for determining whether a person was an accomplice is a simple one: is he liable for prosecution for the same offense for which the defendant is on trial. (*People* v. *Smith,* 26 Cal.App.3d 404, 408 [102 Cal. Rptr. 625].) In the case of Aurora Eslava the question, when asked, becomes rhetorical.

### THE JURY'S QUESTION

After deliberations had commenced, the jury returned with the following question and received the following answer from the trial judge:[1]

"THE FOREMAN: The question was, can a defense attorney recall one of his witnesses after the district attorney has presented his rebuttal witnesses?

"THE COURT: All right, I'll answer that question, ladies and gentlemen of the jury, by stating you have received all instructions of law necessary to decide the issues of fact in this case. I'm ordering you to return to the jury room and to resume your deliberations."

Section 1138 of the Penal Code provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or

---

[1]Pursuant to stipulation by all parties, the case was tried by a commissioner of the superior court sitting as a temporary judge. When the question of the jury was propounded the "trial commissioner" had been reassigned and was unavailable at that time. It was therefore actually fielded by another commissioner who, again by stipulation, was acting as temporary judge. (Const., art. VI, § 21.)

after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

■ The question could and should have been answered, and the answer should have been a qualified "yes." (Pen. Code, § 1093, subd. 4.) However, as this court has recently stated: "The failure of defendant's counsel to object or move for a mistrial . . . might also be construed to be a tacit approval. Approval of the court's action, even though it might have been a technical violation of section 1138 of the Penal Code, cures any possible error. (*People* v. *Winkelspecht* (1965) 237 Cal.App.2d 227, 231 [46 Cal. Rptr. 697].)

"Violations of section 1138 Penal Code do not warrant a reversal of a judgment of conviction unless prejudice is shown. (*People* v. *Woods* (1950) 35 Cal.2d 504, 512 [218 P.2d 981]; *People* v. *Aguilar* (1963) 217 Cal. App.2d 260, 264 [31 Cal.Rptr. 893]; Cal. Const., art. VI, § 13; Pen. Code, § 1258.)" (*People* v. *House,* 12 Cal.App.3d 756, 765-766 [90 Cal.Rptr. 831].)

We have searched the record for any objection to the court's answer by trial counsel, any motion for a mistrial or any possible showing of prejudice; we searched in vain.

### "THE TRANSAMERICA MINING CORPORATION"

The defendant testified that he invested a substantial portion of the Eslava's funds in stock of the "Transamerica Mining Corporation" which *he said* was a subsidiary of "Transamerica Corporation." The deputy district attorney then called to the witness stand the corporate secretary of the Transamerica Insurance Corporation of California, who testified that the corporation owned no mining interests and he found no business records listing any subsidiary in the name of "Transamerica Mining Company."

■ Although not asked for at the time of trial, the defendant now contends that the jury should have been instructed by the trial judge *sua sponte*: ". . . the non-existence of Transamerica Mining Corporation and Robert J. Black had not been established" and that ". . . the jury should have been instructed to view inferior evidence with caution." The trial judge is many things to many people, and many things to many appellate courts, but one trial obligation has not yet been imposed upon him and that is of being both mentally ubiquitous and omniscient. The requirements of being both mentally ubiquitous and percipient are enough; we will not expand the judicial duty nor the ever expanding law of *sua sponte* instructions to include the defendant's proposition of error. "In criminal cases the court has the duty of giving, on its own motion, instructions on the pertinent general principles of law where they are not proposed by the parties. There is no duty,

however, to give instructions upon specific points developed through the evidence introduced at trial unless such instructions are requested by a party or are necessary for the jury to be fully and fairly charged upon the relevant law." (*People* v. *Jackson,* 59 Cal.2d 375, 380 [29 Cal.Rptr. 505, 379 P.2d 937]; *People* v. *Bevins,* 54 Cal.2d 71 [4 Cal.Rptr. 504, 351 P.2d 776].) The retrospectively proposed instruction does not fall within either of the conditions precedent; it was neither "requested" nor "necessary."

## THE NEW TRIAL MOTION

After a defense motion for a continuance of a month and a half, and two and a half months after the verdict was returned, a motion for a new trial predicated upon newly discovered evidence was argued and denied. By this time the defendant had hired a new attorney, who appeared and argued the motion for a new trial. In support thereof he filed his own affidavit which set forth his purported conversations with the trial attorney, a banker in Texas, a lawyer in Texas, and an FBI agent. He further declared that he sent a letter to the Texas Secretary of State. The conversations and correspondence all purportedly related to the possible corporate existence of the "Transamerica Mining Corporation" as a Texas corporation, the corporal existence of Mr. Robert J. Black, and a rumored FBI's "interest" in him.

It was further declared in the declaration of the defendant's new attorney that the supporting affidavits, articles and certificate of incorporation, and confirmation of the existence of this mining corporation from the Texas Secretary of State had been requested and, inferentially, were then probably enroute between Texas and Los Angeles. Although no continuance was sought for their arrival, except again inferentially,[2] it is highly significant that 90 days later when the defendant was returned from the California Department of Corrections under the provisions of section 1203.03 of the Penal Code, they apparently still had not arrived. For the following took place:

"THE COURT: Mr. Morganstern, is there any reason why sentence should not now be pronounced?

"MR. MORGANSTERN: No, your Honor.

---

[2]"MR. MORGANSTERN: Yes, your Honor.

"The court has now a copy of my Motion for a New Trial and Affidavit in Support of the New Trial and Points and Authorities in Support of the New Trial. The District Attorney also has a copy of it.

"As the court accurately characterized my Affidavit or Declaration, it carries implicitly in it a request for a continuance inasmuch as I have not yet heard from the Secretary of State, nor have I received certain document from Pat Davis, the Texas attorney."

"THE COURT: Is there anything you wish to say on behalf or prior to the imposition of sentence?

"MR. MORGANSTERN: No, your Honor. . . ."

The court may grant a new trial "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, *the defendant must produce at the hearing, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given,* and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as, under all circumstances of the case, may seem reasonable." (Italics added.) (Pen. Code, § 1181, subd. 8.)

In *People* v. *Sheran,* 49 Cal.2d 101, 111 [315 P.2d 5] our Supreme Court said: "To entitle a party to a new trial on the ground of newly discovered evidence it must appear that the evidence is not merely cumulative, but is material, and that it is such as to render a different result probable on retrial; and that the party could not with reasonable diligence have discovered and produced it at the trial. (*People* v. *McGarry,* 42 Cal.2d 429 [267 P.2d 254]; *People* v. *Miller,* 37 Cal.2d 801 [236 P.2d 137].) We cannot say, as a matter of law, that a different result would have been probable on a new trial."

We, too, are unable to say that a new trial would probably produce a new result. We can, however, say that the new trial motion's mandatory statutory provisions of "reasonable diligence" and timely witnesses' supporting affidavits were in no way complied with. And as to the latter, we are constrained to say, that it would appear that the new trial supporting affidavits were about as illusory as the stock in the Transamerica Mining Corporation and as nonexistent as the Eslavas now find their lifetime savings to be.

The judgment of conviction is affirmed.

Kaus, P. J., and Stephens, J., concurred.