[No. G005891. Fourth Dist., Div. Three. Aug. 29, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
VO THANH THOI, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

---

[1] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts V, VI and VII.

**COUNSEL**

Bobby D. Youngblood and Alan M. May for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Rudolf Corona, Jr., and Deborah D. Factor, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WALLIN, J.**—Dr. Vo Thanh Thoi was convicted by jury of 11 counts of Medi-Cal fraud, one count of grand theft with a $25,000 great taking allegation, and one count of conspiracy to commit Medi-Cal fraud. He urges reversal, contending: (1) the evidence showed entrapment as a matter of law; (2) the jury was inadequately instructed on entrapment; (3) his communications with an attorney and her later representation of witnesses against him mandate dismissal or reversal; (4) one of his trial lawyers was incompetent; (5) the evidence did not justify an instruction on flight; and (6) the court failed to ask the jury whether they heard disparaging comments allegedly made by an interpreter. We find no error and affirm.

I

In 1983 the state formed the Southeast Asian Program (SEAP) to combat Medi-Cal fraud among Vietnamese doctors and pharmacists. Dr. Vo was one of those eventually caught up in the sweep.

Individuals called "drivers" would bring Medi-Cal cards to the doctors, who would then bill the state without seeing or treating the patients. The drivers were paid by the doctors for the cards and were sometimes given prescriptions which they negotiated at pharmacies for medicines and other merchandise. The holders of the Medi-Cal cards were compensated for the use of their cards with some of this money and merchandise.

Four drivers testified that they brought over 1,200 cards to Dr. Vo without patients. Further testimony established that at least 29 of the "patients" for whom he had billed had never been to his office. During the four-month period alleged in the information, Dr. Vo billed for approximately 4,310 Medi-Cal patients and was paid a total of $163,337.

The defense argued entrapment. Its theory was that the communist government in Vietnam needed medicines and certain types of hard-to-get merchandise. The government had Vietnamese families write to their relatives in the United States requesting these things. It also sent agents to the United States to help obtain these items.

Per the defense theory, the agents infiltrated the SEAP program. Then, acting as undercover operatives for the state, they entrapped the drivers into distributing Medi-Cal cards to unwitting doctors. The operatives also participated directly in the scheme. The doctors were enticed by pleas for prescriptions to send medicine and merchandise to the people suffering in Vietnam.

The defense produced evidence that before the period alleged in the information, some of these undercover agents enticed Dr. Vo to write prescriptions for medicine and merchandise to send to Vietnam. Dr. Vo testified he never billed Medi-Cal for those prescriptions. He also testified that during the period alleged in the information, the drivers did bring patients to his office, although he did not know whether the patients used their own cards. Any money paid to the drivers of which he was aware was for gas money. In other words, he was unaware of the fraudulent scheme.

## II

■ Dr. Vo first contends there was entrapment as a matter of law. While case law concedes the possibility of such a finding by an appellate court, it would be a rare result indeed. (*People* v. *Peppars* (1983) 140 Cal.App.3d 677, 684-685 [189 Cal.Rptr. 879].)

■ The defense of entrapment presents a question for the jury. (*People* v. *Barraza* (1979) 23 Cal.3d 675, 691, fn. 6 [153 Cal.Rptr. 459, 591 P.2d

947].) An appellate court will only find entrapment as a matter of law where the evidence is so compelling and uncontradicted the jury could draw no other reasonable inference. The conduct of law enforcement agents must either generate in a normally law-abiding person a motive for the crime other than ordinary criminal intent or make commission of the crime unusually attractive to such a person. (*People* v. *Barraza, supra,* 23 Cal.3d at p. 690; *People* v. *Kelley* (1984) 158 Cal.App.3d 1085, 1100-1101 [205 Cal.Rptr. 283].)

 Here, the defense assertion of entrapment had facial appeal. It would be repugnant for government agents to spawn Medi-Cal fraud by playing upon the sympathies of Vietnamese doctors for persons suffering in their mother country. Such circumstances would provide a motive for the crime other than ordinary criminal intent and might make its commission unusually attractive.

Dr. Vo's problem is that the evidence in support of his defense was not uncontradicted and does not lead inexorably to a conclusion of entrapment. (Compare *Sherman* v. *United States* (1958) 356 U.S. 369, 373 [2 L.Ed.2d 848, 851-852, 78 S.Ct. 819]; *People* v. *Martinez* (1984) 157 Cal.App.3d 660, 668 [203 Cal.Rptr. 833] [dictum].) According to his own testimony, the only people who made pleas to him about the plight of relatives in Vietnam were not involved in supplying the Medi-Cal cards which enabled perpetration of the fraud. They were agents who approached him in his *Alhambra* office *before* he opened his Westminster office where the alleged fraud later took place involving different individuals.

 While California entrapment law focuses upon the actions of the police and not the predisposition of the accused (*People* v. *Barraza, supra,* 23 Cal.3d at pp. 690-691), the defense must show at a minimum that the improper police practice yielded the charged crime. Otherwise, a defendant would have tantamount to a get-out-of-jail-free card for the first crime he commits after the improper police activity. Here, Dr. Vo did not even bill Medi-Cal for the prescriptions he provided for the agents.

With regard to the actual fraudulent billings, Dr. Vo testified he was unaware of any fraud involving Medi-Cal cards. While the defense of entrapment may be raised concurrently with a denial of the crime (*People* v. *Barraza, supra,* 23 Cal.3d at p. 691; *People* v. *Perez* (1965) 62 Cal.2d 769, 776 [44 Cal.Rptr. 326, 401 P.2d 934]), Dr. Vo's assertion of ignorance provided no rebuttal to the "drivers," who denied any entreaties to the doctor. Even if Dr. Vo had rebutted their testimony on this point, the conflict would have been for the jury to resolve.

Whether the drivers were themselves entrapped—a highly debatable point—matters not. "The law does not recognize a defense of vicarious entrapment [citation] . . . ." (*People* v. *Harris* (1985) 165 Cal.App.3d 324, 332 [211 Cal.Rptr. 493].) Third party entrapment has been recognized only where the person with whom the defendant dealt engaged in conduct which would qualify as entrapment. (See, e.g., *People* v. *McIntire* (1979) 23 Cal.3d 742, 747-748 [153 Cal.Rptr. 237, 591 P.2d 527].) Here, as noted, the jury resolved that question against the defense.

This was an old-fashioned swearing contest. The defense asserted entrapping techniques were used; the prosecution witnesses denied it. ■ " 'Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. [Citation.] To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]' " (*People* v. *Thornton* (1974) 11 Cal.3d 738, 754 [114 Cal.Rptr. 467, 523 P.2d 267].)

■ Dr. Vo's counsel on appeal makes a forceful argument that entrapment occurred here. Unfortunately for Dr. Vo, that argument must be based upon evidence which was rejected by the jury. There was no entrapment as a matter of law.

The Attorney General perceives that Dr. Vo also contends he is entitled to a dismissal based upon outrageous police conduct. If Dr. Vo does make such an argument, it is indeed well camouflaged. However, in an abundance of caution, we address it.

The genesis of this "defense" seems to be a casual comment in *United States* v. *Russell* (1973) 411 U.S. 423 [36 L.Ed.2d 366, 93 S.Ct. 1637].[2] While a subsequent pronouncement by the United States Supreme Court has cast some doubt upon the efficacy of that comment (*Hampton* v. *United*

---

[2] "[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, . . ." (*United States* v. *Russell, supra,* 411 U.S. at pp. 431-432 [36 L.Ed.2d at p. 373].) This language connotes a procedural bar rather than a defense to be determined by a jury. For sake of ease, we will refer to it as a defense.

*States* (1976) 425 U.S. 484, 489-490 [48 L.Ed.2d 113, 118-119, 96 S.Ct. 1646]), California cases have treated the defense as viable. (*People* v. *McIntire, supra,* 23 Cal.3d at p. 748, fn. 1; *Boulas* v. *Superior Court* (1986) 188 Cal.App.3d 422, 429 [233 Cal.Rptr. 487]; *People* v. *Towery* (1985) 174 Cal.App.3d 1114, 1133-1137 [220 Cal.Rptr. 475]; *People* v. *Harris, supra,* 165 Cal.App.3d at pp. 330-331; *People* v. *Peppars, supra,* 140 Cal.App.3d at p. 685.)

■ In cases where the thrust of the defense is that the government improperly instigated the crime, outrageous police conduct is a corollary of entrapment under California law. This is so because in California, the focus in entrapment cases is on the actions of the police. Where their actions would tend to cause a reasonable law-abiding person in the defendant's position to commit a crime he otherwise would not commit, entrapment will be found even though the person has a predisposition to commit the crime. (*People* v. *Barraza, supra,* 23 Cal.3d at pp. 690-691.) The converse is true under federal law. There, entrapment does not exist unless the defendant had no predisposition to commit the crime. (*United States* v. *Russell, supra,* 411 U.S. at pp. 433-436 [36 L.Ed.2d at pp. 374-376].)

Thus, under federal law, there is a rationale for the defense of outrageous police conduct in entrapment-type situations. The conduct of the police may be so egregious that the sanction of dismissal would be appropriate notwithstanding the defendant's propensity to commit the crime. In California, where entrapment law looks primarily at the conduct of the authorities in the first instance, the defense of outrageous police conduct is superfluous.[3] We hold the doctrine does not exist separately within the context of entrapment cases.

■ Even if it did exist, there is a question whether the issue was preserved for appeal. If it was raised by virtue of the entrapment defense, the jury's verdict effectively answers it. If it was not, the issue was not raised below at all.[4]

---

[3] In *People* v. *McIntire, supra,* 23 Cal.3d at page 748, footnote 1, the California Supreme Court suggested in dictum that the defense might be available where the outrageous police conduct was not directed at the defendant. In *Hampton* v. *United States, supra,* 425 U.S. 484, 490 [48 L.Ed.2d at pp. 118-119], the United States Supreme Court held that a defendant's due process rights are not triggered unless he is the direct victim of the outrageous conduct. We have found no California case holding the defense applicable unless the conduct in question directly impacted the defendant. It would overly burden the administration of justice to allow vicarious application of the defense in all but the most extreme cases.

Of course, there are situations outside the entrapment arena where the defense has just application. For example, in *Boulas* v. *Superior Court, supra,* 188 Cal.App.3d 422, the court applied the doctrine to dismiss an action where the district attorney improperly persuaded a defendant to discharge his attorney by promising a deal which he later withdrew.

[4] The question of whether the issue should be raised pretrial or at trial has not been answered by our courts. In nonentrapment cases, the issue has been raised pretrial. (*Boulas* v.

Finally, even if we were to review the issue de novo, we would not find outrageous police conduct as to Dr. Vo. Medi-Cal fraud was being perpetrated and the authorities sought to expose the guilty parties by use of undercover operatives. While there is some indication the operatives *may* have played upon the sympathies of some doctors on some occasions, there is no evidence the government fostered, encouraged, or condoned this ploy. In all, the motives and actions of the government were reasonable, in good faith, and aimed at the suppression of Medi-Cal fraud in general.

While these facts did not preclude Dr. Vo from taking aim at the operatives in mounting an entrapment defense, they do not rise to the level necessary for Dr. Vo to prevail on the outrageous conduct issue separately on appeal, assuming it may be raised at all. (*People* v. *Peppars, supra,* 140 Cal.App.3d at p. 686.) There was no entrapment or outrageous police conduct as a matter of law.

### III

■ In a related claim Dr. Vo contends that the trial court erred by failing to answer certain jury questions which arose during jury deliberations.[5] The court should have answered the questions but the error does not require reversal.

Penal Code section 1138 provides in relevant part: "After the jury have [*sic*] retired for deliberation, . . . if they desire to be informed on any point of law arising in the case, . . . the information required must be given . . . ." The questions asked by the jury were proper legal inquiries based

---

*Superior Court, supra,* 188 Cal.App.3d 422, 428; *People* v. *Moore* (1976) 57 Cal.App.3d 437, 441 [129 Cal.Rptr. 279].) The entrapment cases do not clearly indicate whether the issue was raised at all in the trial court. (*People* v. *Towery, supra,* 174 Cal.App.3d 1114, 1133; *People* v. *Peppars, supra,* 140 Cal.App.3d 677, 685-687; cf. *People* v. *Harris, supra,* 165 Cal.App.3d 324, 330-333.) We need not deal with the issue here; however, we suggest that defendants who wish to rely upon the issue outside of an entrapment defense raise the issue by a pretrial motion with appropriate pleadings and proof.

[5] The court first answered "yes" to a jury question about whether entrapment could exist if the undercover agents manipulated the drivers to make sympathetic requests for prescriptions to the doctor. The questions which the court declined to answer were: "1) If a person was entrapped on one day, then commited [*sic*] the same crime on another day, without the elements of entrapment being present, does the entrapment defense hold for the second offense. [*Sic*.] 2) If a doctor is entrapped into writing a prescription, and he then falsely bills MediCal [*sic*] for an office visit, is the false billing, a different but related act, also entrapment. [*Sic*.] 3) The entrapment instruction says: ' . . . would induce such a person to commit the act because of friendship or sympathy, instead of a desire for personal gain . . .' What does that 'instead' mean? In this case, elements of sympathy *and* greed are both present. Are we to decide if it is more greed than sympathy, more sympathy than greed, or they are even? If we decide that it is more greed than sympathy, is the entrapment defense eliminated? What if they are evenly balanced?"

upon the facts of the case. The jurors did not ask how to determine the facts; they asked for guidance in using those facts to reach a proper verdict using applicable law. Their questions could and should have been answered. (*People* v. *Kageler* (1973) 32 Cal.App.3d 738, 745-746 [108 Cal.Rptr. 235].)

However, our analysis does not end there. When the court expressed an inclination to leave the questions unanswered, defense counsel launched into a lengthy speech supporting inaction by the court, and even suggested the jury should be admonished to rely on the instructions previously given. He actively and vigorously lobbied against further instruction. Counsel's conduct either waived or invited any error by the court. (*People* v. *Garcia* (1984) 160 Cal.App.3d 82, 89 [206 Cal.Rptr. 468]; *People* v. *Litteral* (1978) 79 Cal.App.3d 790, 796 [145 Cal.Rptr. 186]; *People* v. *Kageler, supra,* 32 Cal.App.3d 738, 746.)[6]

## IV

■ Dr. Vo argues the case should be dismissed based upon a perceived conflict of interest involving an attorney with whom he had spoken twice. We find no merit in the contention.[7]

When Dr. Vo's fiancee, a pharmacist, was arrested along with a number of doctors and drivers in February 1983, Dr. Vo consulted with Attorney Becky Dugan about representing her. He spoke with Dugan briefly at court when his fiancee was arraigned and at some length during a conference the fiancee had at Dugan's office.

Dr. Vo expressed some fear of being arrested and said he had some blank prescription pads. However, he gave Dugan no incriminating information, nor information which led her to believe he would be charged. He was not mentioned in any records she possessed. They did not discuss any of the drivers or his Medi-Cal dealings. Although Dr. Vo sought and obtained a promise Dugan would help him if he were charged, she was never retained.

At a later time, Dugan represented two of the drivers who dealt with Dr. Vo, Dung Vu and Mai Thi To Mac. She arranged for Dung Vu to testify against Dr. Vo as part of a plea bargain.

---

[6] Since *People* v. *Wickersham* (1982) 32 Cal.3d 307, 330 [185 Cal.Rptr. 436, 650 P.2d 311] held that the court has a duty to properly instruct the jury even in the absence of a request by counsel, we prefer the invited error analysis. Here, based upon the evidence, defense counsel had reason to object to further instruction. Further enlightenment may well have speeded the jury conclusion that whatever improper conduct by the agents existed had little or nothing to do with the charged crimes.

[7] Dr. Vo preserved this issue by bringing a motion before trial. At that time he only sought to suppress the testimony of certain drivers who testified against him at trial. Thus, even if his contention had merit, he would be entitled to a reversal and retrial at most.

While Dugan's actions are "hardly calculated to inspire public trust in the ' "scrupulous administration of justice and in the integrity of the bar" ' " (*Yorn* v. *Superior Court* (1979) 90 Cal.App.3d 669, 676 [153 Cal.Rptr. 295]), nothing about her conduct mandates a dismissal or other relief for Dr. Vo. Before discussing why, we stress our awareness that attorney-client issues deserve the most strict scrutiny.

■ "Few precepts are more firmly entrenched than that the fiduciary relationship between attorney and client is of the very highest character [citations] and, even though terminated, forbids (1) any act which will injure the former client in matters involving such former representation or (2) use against the former client of any information acquired during such relationship. [Citation.] Under the promulgated rules governing professional conduct, which apply in criminal and civil cases alike [citation], the ethical prohibition against acceptance of adverse employment involving prior confidential information includes *potential as well as actual use* of such previously acquired information. [Citation.]" (*Yorn* v. *Superior Court, supra,* 90 Cal.App.3d at p. 675; accord *Leversen* v. *Superior Court* (1983) 34 Cal.3d 530, 538 [194 Cal.Rptr. 448, 668 P.2d 755]; see Bus. & Prof. Code, § 6068, and Rules Prof. Conduct, former rule 4-101.)

■ Initially, we doubt that any attorney-client relationship was formed between Dugan and Dr. Vo sufficient to trigger application of the foregoing rules. Although an issue of law (*Meehan* v. *Hopps* (1956) 144 Cal.App.2d 284, 287 [301 P.2d 10]), we note the trial court found no such relation existed. Dr. Vo only saw Dugan on two occasions. They did not discuss any facts related to Dr. Vo, other than that he had some blank prescription pads and a fear of possible arrest. No incriminating information was passed. Discussion of any representation by Dugan was related strictly to the future.

While these encounters were sufficient to give rise to the attorney-client privilege (Evid. Code, § 951; *Maier* v. *Noonan* (1959) 174 Cal.App.2d 260, 266 [344 P.2d 373]), there is no suggestion that Dugan would ever be called upon to testify against Dr. Vo. The real question is whether after the chats with Dr. Vo, she was precluded from representing the drivers who testified against him. ■ We hold that a substantial relationship must exist before such a bar would arise. (See *Vangsness* v. *Superior Court* (1984) 159 Cal.App.3d 1087, 1090-1091 [206 Cal.Rptr. 45].) ■ There was none here.

Even if we found an attorney-client relationship arose from these brief encounters, the result would not change. The evil inherent in representing multiple persons in a related matter is that the attorney might use

confidential information from one client against another. In the absence of such information, the harm is speculative.

■ Where the relationship is substantial, the courts will presume that confidential information was imparted which would preclude later representation of an adversary. (*Gregori* v. *Bank of America* (1989) 207 Cal.App.3d 291, 304 [254 Cal.Rptr. 853].) Conversely, if no such relationship is shown, it is incumbent upon the former client to establish that confidential information was obtained by the attorney. (*Vangsness* v. *Superior Court, supra,* 159 Cal.App.3d at pp. 1090-1091.)

■ This case falls in the latter category. Dugan's testimony established that nothing in her conversations with Dr. Vo in any way assisted her representation of the drivers or contributed to his conviction. ■ Her representations as an officer of the court are accepted in the absence of proof to the contrary. (See *Leversen* v. *Superior Court, supra,* 34 Cal.3d at p. 539.)

■ We note that this case does not involve any conflict of interest on the part of Dr. Vo's trial counsel and we are not concerned with Sixth Amendment implications which arise in such cases. (See, e.g., *People* v. *Mroczko* (1983) 35 Cal.3d 86, 103-105 [197 Cal.Rptr. 52, 672 P.2d 835].) We deal simply with a brief encounter of the legal kind which resulted in no substantial relationship or transmittal of material information. Under these circumstances Dr. Vo was not entitled to any remedy.

V-VII*

. . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Scoville, P. J., and Sonenshine, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 20, 1989.

---

*See footnote 1, *ante,* page 689.