[No. A052998. First Dist., Div. Three. July 29, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
JESUS TORRES MENDOZA, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part V.

## COUNSEL

Peter F. Goldscheider, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Donna B. Chew and Michael E. Banister, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MERRILL, Acting P. J.**—Jesus Torres Mendoza appeals from a judgment of conviction entered on a jury verdict finding him guilty of possession of cocaine for sale (Health & Saf. Code, § 11351) and transporting and offering cocaine for sale (Health & Saf. Code, § 11352), and finding to be true the sentence enhancement and probation ineligibility allegations based on the amount of cocaine possessed for sale (Health & Saf. Code, § 11370.4; Pen. Code, § 1203.073). We affirm.

## I

## FACTS

Louis Anthony Medina worked as a part-time paid informant in narcotics cases for the Oakland Police Department. Previously, he had been arrested for possession of cocaine; he had successfully gone through a two-year diversion program, and the charges had been dismissed. Medina's first assignment as a police informant was with Oakland Police Officer John Gutierrez.

As of the time of trial, Officer Gutierrez had been a police officer for 12 years. He had worked as a narcotics investigator for the last five years, most recently with the Alameda County Narcotics Task Force. As part of this job, Gutierrez worked extensively with informants such as Medina. In September 1990, Medina began working with Gutierrez on the instant case.

Medina's modus operandi as a police informant was to cultivate the impression among his acquaintances that he was a kind of "middle man" in the drug trade. He would then go about his daily routine and wait for individuals to approach him with proposed illegal narcotics transactions, without actively targeting suspected drug dealers or seeking out illegal activity. Medina would report all such propositions to Officer Gutierrez, who would then make the decision whether or not to proceed with an investigation. Medina could not take any further action on a drug transaction without Gutierrez's approval. Once he received instructions to proceed, Medina would act the role of a middleman or go-between, arranging to obtain a purchaser for a dealer of large quantities of narcotics.

On September 13, 1990, Medina was approached by an acquaintance who remarked about the fact that Medina carried a pager or "beeper" and drove different cars at different times. When Medina told him that "this is strictly for business," the man told him, "I got somebody who can do a lot of business with you." Medina asked, "[O]h, can he do kilograms?" to which the man responded affirmatively. Medina gave the man his pager telephone number. Later, the man called Medina and arranged a meeting with a third man named "Hector," subsequently identified as Hector Gonzalez.

At the meeting, Gonzalez told Medina that he had a "compadre" in Redwood City who could supply Medina with kilogram quantities of cocaine. Medina gave Gonzalez his telephone number, told Gonzalez that he would have to talk to his own "people," and asked Gonzalez to get in touch with him after Gonzalez had talked with his (Gonzalez's) "connection."

Medina called Officer Gutierrez that night and informed him about his meeting with Gonzalez.

On September 19, 1990, Gonzalez called Medina and told him that his "compadre" had received five kilograms of cocaine, of which he was willing to sell Medina two. They agreed on a price of $28,000 per kilogram. Medina went to the Oakland Police Department to talk with Gutierrez about the deal. While he was there, he received another page from Gonzalez. This time, Gonzalez confirmed the deal and the price; he told Medina to meet him and drive him to Redwood City, where Medina could purchase the two kilograms of cocaine from Gonzalez's "connection." Officer Gutierrez approved this arrangement. According to standard procedure, Gutierrez searched Medina and his vehicle for guns and drugs, and then followed him to Gonzalez's house. The plan was for Medina to contact the seller and introduce Gutierrez as his "brother-in-law." Gutierrez was wearing a detection wire; Medina was not.

As Medina drove Gonzalez to Redwood City, Gonzalez said that his compadre, identified by the name of Jesus, "can do a lot of kilograms," that he was a person Medina "could trust" for "further negotiations" in the future, and that the cocaine he was going to sell to Medina was "[t]he best quality that there was out on the street, and not to worry about anything." Gonzalez told Medina that "Jesus . . . wants us to start off with two kilograms . . . , because he doesn't know you and he wants to get to know you. He wants to talk with you. And later on, if everything goes well, then, you guys can do it every week and can do more. Do five, four to five kilograms a week." Gonzalez asked Medina about the money; Medina told him that his "brother-in-law" had the money, and that they had to see the cocaine first before letting Gonzalez see any money.

The initial plan had been for the drug transaction to take place at the Price Club in Redwood City, for reasons of ease in police surveillance; and for the "bust" to take place with the assistance of officers from the San Mateo County Narcotics Task Force. However, Gonzalez insisted that they stop at a Mexican restaurant called El Grullense. Gonzalez telephoned "Jesus," and told him they had arrived. Medina walked over to Gutierrez's car, which was stopped nearby, and told him what to expect. Gutierrez contacted the San Mateo officers and told them of the change in plans. About 10 minutes later, appellant arrived driving a late model red Mustang. At about the same time, an unmarked van containing San Mateo officers arrived and parked nearby.

Appellant asked Medina for the money. Medina replied that the money was with Gutierrez, and that he had to "see the dope first" before showing

him the money. Appellant told Medina that if he had gotten in contact with him earlier, he would have sold Medina five kilograms instead of two. Medina and Gonzalez got into appellant's car, and appellant drove them to an alley near 5th and Page Streets in Redwood City. The undercover police vehicles did not follow. Appellant stopped his car at a house which he identified to Medina as his residence. All three got out of the car, and appellant opened the garage door. Medina, who was scared, asked if it was safe; appellant assured him that everything was all right, and that no police would be around. Appellant gave Medina the impression that he had done this before, and that he was confident of what he was doing and where he was doing it.

Appellant took Gonzalez and Medina into the garage and closed the garage door. Appellant then went inside the house adjoining the garage. He returned a minute later with a brown paper bag, out of which he pulled a yellow package. Medina recognized the packaging as the same kind he had previously seen used for cocaine. He made a hole in the package with a key, took out some powder, examined it, and told appellant that it looked good. Appellant told him that the cocaine came with "a full money back guarantee on it." Appellant then went back into the house and returned with a second kilogram of cocaine. Appellant wanted to conclude the transaction there in the garage, but Medina told him that they would have to return to his partner (Gutierrez), and he would give appellant the money. After Gonzalez told appellant, falsely, that he had seen and counted the money, appellant agreed to go back to Gutierrez's car. The three then left the garage and got back into appellant's car.

As they drove back to El Grullense, appellant told Medina that now that he knew Medina was going to buy from him that day, he should have saved five kilograms for him. Appellant assured Medina that if everything went well, they could do four or five kilograms a week, "[n]o problem." Medina complimented appellant's car, and appellant told him he had paid for it "all in cash." Medina asked about appellant's car phone, and appellant said that "it's just for business."

When they had arrived at the restaurant, they agreed that Medina would take the two packages of cocaine to Gutierrez, and would then bring back the money. However, Medina walked up to Gutierrez and told him that the two kilograms of cocaine were in the backseat of appellant's car in a brown bag, and that "[e]verything looked okay." Officer Gutierrez transmitted the arrest signal over his radio. After that, two police vans converged on appellant's car, and appellant and Gonzalez were arrested.

In his defense, appellant presented the testimony of his three sisters, his brother-in-law, and his wife. Each of them testified that they answered

several telephone calls to appellant from someone named Hector during the two weeks prior to appellant's arrest. Hector would always ask for appellant. If appellant happened to be home at the time, he would tell his family to tell Hector that he was not there.

Appellant testified that he first met Gonzalez at a bar where Gonzalez was selling tape cassettes of Mexican music. According to appellant, around September 8, 1990, Gonzalez began calling him up and trying to talk to him about "some business" involving a friend of Gonzalez's named "Tony" who had some money and wanted to buy something. Appellant testified that Gonzalez "gave me the idea more or less what kind of business it was. I said I was not interested." Later, on another day, appellant again encountered Gonzalez at the bar. Gonzalez began telling appellant about his family and how he needed money because his wife was pregnant. He told appellant that he had a friend named Tony who had $56,000, and that he wanted appellant to get some cocaine for Tony. Gonzalez had already gone to three other persons without success. Appellant told Gonzalez that it was dangerous and illegal, and refused to help him. Gonzalez left the bar, appearing "a little sad."

Appellant testified that after Gonzalez left the bar, another person sitting nearby, named "Francisco," told him that he had overheard the conversation and that he could help appellant.[1] Appellant refused the offer, telling Francisco that it was dangerous and against the law. Francisco persisted, insisting that there would be no problem in helping Gonzalez obtain some cocaine. Later that evening Francisco gave appellant a ride home from the bar.

Appellant further testified that for the next several days, Gonzalez continued to try to contact him, both at the bar and over the telephone at his home. Appellant did not want to talk with Gonzalez, so he told his wife to tell Gonzalez that he was not there. When Gonzalez did get in touch with him, appellant again told him that he was not interested in obtaining cocaine for "Tony." On September 19, 1990, appellant spoke with Gonzalez for the last time. Gonzalez called appellant at the bar and asked him to talk to his friend Tony. Gonzalez put Tony on the telephone, who urged appellant, "[p]lease, why don't you try to help Hector." Tony told appellant that he was going to come to Redwood City "with an amount of money," that there were people in the bar who could get what he wanted, and "[p]lease try to talk with that man." Tony then hung up on appellant. Later that evening, Gonzalez called appellant at the bar again, and told appellant that he and Tony were in Redwood City with $56,000. Tony got on the telephone, and urged appellant to ask one of his friends if he could obtain two kilograms of cocaine for

---

[1]Appellant testified that he did not know Francisco's last name.

$56,000. When appellant again refused, Tony said: "[T]his is about your friend . . . . I know that your financial situation is not good. . . . [I]t's something that's going to go well. Nothing is going to happen to us. I am a good man. I am a Mexican. And I don't think there is anything inconvenient about doing that." Finally, appellant agreed to talk to Francisco.

According to appellant he told Francisco that he knew someone with $56,000, and he asked Francisco to make direct contact with the man. Francisco refused, saying he did not know the person. However, he offered to go to appellant's house, wait outside, and pay appellant $500 if appellant would bring Gonzalez and Tony to appellant's house himself. Appellant thought about it for three or four minutes and then decided to do it. Appellant went to the agreed meeting place at El Grullense restaurant to meet Gonzalez and Tony. Tony had the voice of the man appellant had talked with on the telephone. Appellant suggested that they go to his house, and they agreed.

Appellant drove Gonzalez and Tony to his house and left them in his garage while he went outside to look for Francisco. He found Francisco waiting by a white car. Francisco asked appellant if he had the money. When appellant said no, Francisco told him that he had to go back and get it. Appellant asked Francisco to talk to Tony, but Francisco said no, and added: "[Y]ou tried to do it, and now you have to do the whole thing." Francisco gave appellant a bag, which appellant took back to the garage and gave to Tony. After Gonzalez and Tony examined the packages in the bag, appellant drove them back to the restaurant. Tony got out of the car and told them he was going to get the money. Shortly thereafter, appellant and Gonzalez were arrested.

Under cross-examination, appellant testified that he knew that Gonzalez and "Tony" were trying to buy two kilograms of cocaine from him, that this was dangerous and illegal, and that he would get in trouble for it. He testified that there were three reasons why he took part in the drug transaction: because he felt sorry for Gonzalez and wanted to help him; because he was afraid of Francisco; and because he himself needed some money for automobile payments and the monthly charge on his mobile phone. Appellant testified that he earned between $600 and $800 per month from his janitorial and yard work. He paid $300 per month on the automobile and car phone, while his share of the rent, food and utilities was approximately $525 per month. Appellant's testimony about how much money he expected to receive from Francisco for arranging the transaction—whether $300 or $500 or an unknown amount—was unclear.

Despite appellant's testimony about his motivating desire to assist Gonzalez and his belief that Gonzalez was a good friend and a good person, he

acknowledged on cross-examination that he had never visited Gonzalez's home; he had never had Gonzalez to his own home; he had never met Gonzalez's wife; and he only knew Gonzalez from seeing him at the bar. None of the members of appellant's family testified to knowing or having ever met Gonzalez.

## II

### INSTRUCTION ON DERIVATIVE ENTRAPMENT

■ Appellant contends that the trial court erred in not giving his requested special instruction on derivative entrapment, on the ground that "the police through Medina knew and took advantage of [Hector] Gonzalez's appeals to his friendship with appellant" in order to induce appellant to commit the crime. We disagree.

The trial court properly instructed the jury on entrapment, giving three separate instructions setting forth the objective theory of the entrapment defense; that is, that it is a defense to a criminal charge that the commission of the alleged criminal act was induced by the conduct of law enforcement agents, or persons acting under their direction and control, "when the conduct was such as would likely induce a normally law-abiding person to commit the crime." Contending that the jury could find Hector Gonzalez to be the entrapping agent, rather than being limited to consider whether or not Medina engaged in entrapping conduct, appellant asked the trial court to give an instruction expressly stating that a person subject to manipulation by law enforcement agents, who engages in procuring the commission of a crime by another, may be considered an agent of entrapment even if he or she is unaware of the law enforcement agent's identity or object.[2]

The defense of "derivative entrapment" is based on the decision in *People v. McIntire* (1979) 23 Cal.3d 742 [153 Cal.Rptr. 237, 591 P.2d 527]. In that case, the Supreme Court stated: "The purposes of the entrapment defense can be fulfilled only if it is understood that one can act as the agent of a law enforcement official without realizing the identity of his principal; the unwitting agent, though he may not appreciate the true nature of his role, is nonetheless being manipulated as the officer's tool in a plan to foster a crime and entrap its perpetrator. . . . 'The function of . . . enforcement officials is to investigate, not instigate, crime; to discover, not to promote, crime.'

---

[2]Appellant's requested special instruction was as follows: "Manipulation of a third party by law enforcement agents to procure the commission of a criminal offense by another renders the third party a government agent for purposes of the entrapment defense even though the third party remains unaware of the law enforcement agent's identity or object."

Improper governmental instigation of crime is not immunized because it is effected indirectly through a pliable medium." (*Id.*, at p. 748.)

The difficulty with this approach in the instant case is that here, there was no factual showing that the police, through Medina, were consciously taking advantage of appellant's sympathy for Gonzalez's alleged financial plight, or that Gonzalez was in any way controlled or unconsciously manipulated by the police. Unless Gonzalez was the agent of the police, whether knowingly or unwittingly, the question of whether his statements or actions induced appellant to commit a crime is simply irrelevant. For there to be entrapment, the inducement must ultimately have come from the police, whether or not through an unwitting third party. In this case, the only evidence of Gonzalez's connection with the police was that *he* made the offer to sell cocaine to Medina, through another unnamed intermediary who made the first approach to Medina. There was *no* evidence that Medina or any other police agent manipulated Gonzalez in order to procure the commission of a criminal act by either Gonzalez *or* appellant.

The salient fact on this record is that the evidence was simply insufficient to show entrapment—that is, conduct such as would likely induce a normally law-abiding person to commit the crime in question. (*People* v. *Barraza* (1979) 23 Cal.3d 675, 689-690 [153 Cal.Rptr. 459, 591 P.2d 947]; CALJIC Nos. 4.60, 4.61, 4.61.5.) Even if we were to accept the premise of appellant's argument that Gonzalez was the unwitting agent of Medina in seeking to procure appellant's commission of a crime, appellant's own testimony regarding his casual acquaintance with Gonzalez and the alleged actions and statements by Gonzalez about his financial needs are not the kind of conduct which would "likely [] induce a normally law-abiding person to commit the offense" of sale of narcotics. (*People* v. *Barraza, supra,* 23 Cal.3d at pp. 689-690; cf. *People* v. *Thoi* (1989) 213 Cal.App.3d 689, 695 [261 Cal.Rptr. 789]; *People* v. *Harris* (1985) 165 Cal.App.3d 324, 332 [211 Cal.Rptr. 493].) In short, even if there was error in the trial court's refusal to give the subject instruction, there was no prejudice to appellant's case.

### III

### EXCLUSION OF GONZALEZ'S STATEMENTS TO DEFENSE WITNESSES

■ Appellant contends that the trial court erred in excluding certain evidence of what Gonzalez said to appellant and appellant's relatives during his telephone calls to appellant's residence. Appellant's argument is unpersuasive.

In the first place, with regard to statements made by Gonzalez to appellant's relatives during his telephone calls, the record makes it clear that

defense counsel did not intend to elicit any more facts than that Gonzalez called, asked for appellant, and left his name as "Hector." The trial court permitted this. Moreover, all the witnesses testified that Gonzalez did not leave any messages, but merely asked for appellant.

With regard to appellant's own testimony about what Gonzalez said to him, the trial court *permitted* the admission of this evidence, specifically on the grounds that it was not offered to prove the truth of the matter asserted, but to show appellant's state of mind in reacting to what Gonzalez said to him. Thus, appellant was allowed to testify that Gonzalez put pressure on him by making personal appeals to appellant for sympathy and assistance. What the trial court did *not* permit was testimony by appellant of what Gonzalez told appellant that Medina had told Gonzalez; specifically, that Medina was allegedly pressuring Gonzalez to procure cocaine.

As the colloquy between the trial court, defense counsel and the prosecutor makes clear, appellant was unable to show that this testimony was admissible under Evidence Code section 1250 as a statement of the declarant's then existing state of mind, because only *appellant's* state of mind was relevant to the entrapment defense, not the alleged states of mind of either of the "declarants," Gonzalez and Medina.[3] The only possible relevance of Gonzalez's statements to appellant was as evidence that Medina was *in fact* pressuring or manipulating Gonzalez. Gonzalez's state of mind was irrelevant to this factual issue, which depended on what Medina *actually* said or did. In other words, the question was whether Gonzalez was actually an agent (albeit unwittingly) of Medina and the police, not what Gonzalez's mental state was at the time. As to this question, Gonzalez's out-of-court statements to appellant about what Medina said or did were inadmissible hearsay offered for proof of the asserted fact that Medina pressured Gonzalez to induce appellant to commit a crime.

## IV

### DENIAL OF REQUESTED CONTINUANCE

■ Appellant called Hector Gonzalez as a defense witness at trial. As expected, Gonzalez declined to answer questions by invoking his privilege

---

[3]Evidence Code section 1250 provides as follows: "(a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when:

"(1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or

"(2) The evidence is offered to prove or explain acts or conduct of the declarant.

"(b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

against self-incrimination. When it became apparent that Gonzalez would not testify, defense counsel asked the trial court for a continuance of the trial until after Hector Gonzalez had been sentenced in his separate criminal trial, claiming that Gonzalez would then be free to testify on appellant's behalf. The trial court denied this motion. Appellant now contends that this denial was erroneous. We disagree.

Under Penal Code section 1050, criminal trials are given precedence over civil proceedings, and are to be expedited "to the greatest degree that is consistent with the ends of justice." (Pen. Code, § 1050, subd. (a).) "Continuances shall be granted only upon a showing of good cause. Neither the convenience of the parties nor a stipulation of the parties is in and of itself good cause." (Pen. Code, § 1050, subd. (e).) "[T]he court has broad discretion to grant or deny the motion for continuance [citations]." (*People* v. *Grant* (1988) 45 Cal.3d 829, 844 [248 Cal.Rptr. 444, 755 P.2d 894].)

In this case, contrary to the assumption of defense counsel, there was no guarantee whatsoever that Gonzalez would not continue to invoke his privilege against self-incrimination during the pendency of his appeal. Furthermore, appellant's attorney could not represent to the court what Gonzalez's testimony would be as he had been told by Gonzalez's attorney not to speak to Gonzalez and Gonzalez was not scheduled to be sentenced for almost six weeks. Appellant's attorney could do no more than represent that Gonzalez *might* be persuaded to allow his sentencing to be expedited. On the other hand, Gonzalez's own attorney had indicated to the prosecution that he would endeavor to continue his client's sentencing as long as necessary so that it would take place *after* the conclusion of appellant's trial.

We conclude that the trial court did not abuse its discretion in denying the requested continuance. Recent additions to both the California Constitution and the Penal Code have guaranteed the People the right to a speedy trial. (Cal. Const., art. I, § 29; Pen. Code, § 1050, subd. (a).) It is clear from the record that Gonzalez was not likely to testify in appellant's trial under any circumstances. There was no error.

V

RESTRICTION OF CROSS-EXAMINATION*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 504.

# VI

## DISPOSITION

The judgment is affirmed.

Chin, J., and Werdegar, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 10, 1992.