Filed 7/25/14  P. v. Luna CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B244722 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA119342) |
| v. | |
| NESTOR LUNA et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Arthur M. Lew and Paul A. Bacigalupo, Judges.  Nestor Luna's judgment is affirmed.  Domingo Pena's judgment is affirmed as modified.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant Nestor Luna.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant Domingo Pena.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II, Supervising Deputy Attorney General, Marc Kohm, Steve Mercer, and William H. Shin Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendants and appellants Nestor Luna (Luna) and Domingo Pena (Pena) were tried together before separate juries. Luna's jury found him guilty of first degree murder. (Pen. Code, §187, subd. (a)[1].) Pena's jury found him guilty of first degree murder (§ 187, subd. (a)), found true personal and principal firearm use and discharge allegations (§ 12022.53, subds. (b), (c), (d), & (e)(1)), and found true the allegation that Pena committed the murder for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members (§ 186.22, (b)(1)(c)). The trial court sentenced Luna to 25 years to life and Pena to 50 years to life in state prison.

On appeal, defendants contend the trial court violated their right to confront a witness when it allowed the prosecution to read the witness's preliminary hearing testimony; and the trial court erred in failing to instruct their respective juries on the lesser included offense of voluntary manslaughter based on a sudden quarrel or heat of passion. Luna also contends that his first degree murder conviction is not supported by sufficient evidence; the trial court erred in allowing his jury to deliberate before it answered a jury question; the trial court violated his right to due process by failing to instruct his jury sua sponte that the prosecution had to prove the absence of heat of passion as an element of murder; and the trial court abused its discretion in denying his motion to reduce his conviction to voluntary manslaughter or, alternatively, in failing to reduce his conviction from first to second degree murder because his sentence of 25 years to life was cruel and unusual punishment. Pena also contends that the trial court erred in refusing his request to instruct his jury with CALCRIM No. 522 that provocation may reduce murder from first degree to second degree; in instructing his jury with CALCRIM No. 371 on consciousness of guilt; and in awarding him one day too few of actual custody credit. Luna joins those of Pena's arguments that benefit him. To the extent that they benefit Pena, Pena joins Luna's arguments that the admission of the witness's

---

[1] All statutory citations are to the Penal Code unless otherwise noted.

2

preliminary hearing testimony violated his right to confrontation; the trial court erred in failing to instruct the jury on the lesser included offense of voluntary manslaughter based on heat of passion; and the trial court erred in failing to instruct the jury sua sponte that the prosecution had to prove the absence of heat of passion. We affirm Luna's judgment. We order Pena's abstract of judgment modified to reflect an award of 428 days of actual custody credit, and otherwise affirm his judgment.

## BACKGROUND

### I.  Evidence Presented to Both Juries

In February 2010, Luna and his brother Juan Pablo Luna (Juan Pablo)[2] lived in their parents' house at 1815 East 109th Street in Los Angeles. Maria Toro, Juan Pablo's girlfriend, lived with the Luna family. There were three houses on the property at 1815 East 109th Street—a house closest to the street, a middle house, and a back house. The Luna family lived in the house closest to the street. Maria Peralta and Wendy Reyes lived in the middle house. Luna's girlfriend, Irma Guizar (Irma), her sister, Silvia Guizar (Silvia),[3] and Viviana Jimenez[4] lived in the back house.

Jesus Peralta (Peralta), Maria Peralta's[5] uncle, worked as an armed security guard. Peralta was good friends with Juan Pablo and got along with Luna. Peralta visited Juan Pablo often and sometimes slept in Luna's bedroom. Maria Peralta said that her uncle would "flip out"—i.e., become aggressive—when he was drunk. People did not take

---

[2]  Because Luna and Juan Pablo share a last name, we will refer to defendant by his last name and Juan Pablo by his first and middle names.

[3]  Because Irma and Silvia Guizar share a last name, we will refer to each by her first name.

[4]  Jimenez's preliminary hearing testimony was admitted after the trial court found that the prosecution had exercised due diligence to secure her presence at trial.

[5]  Because Maria Peralta shares a last name with Jesus Peralta and a first name with Maria Toro, we will refer to her by her full name.

3

Peralta seriously when he "flipped out"—he "talked smack" to people and "then he would just be on his way . . . ." According to Maria Peralta, her uncle was a "sloppy drunk" who "would get loud" with Pena and Luna when he was drunk.

Although Luna and Peralta got along, there were times when they had conflicts. On occasion, Luna's father would throw out Peralta when Peralta was out of control. One time, Peralta poured a beer on Luna and tried to force him out of his seat by pulling him by a chain around his neck. Luna pulled a gun, an incident about which Peralta told Luna's father. Luna's father took the gun from Luna and told Peralta he was no longer welcome. That incident also caused bad feelings between Pena and Peralta.

On December 12, 2009, Peralta was at the 1815 East 109th Street property. According to Maria Peralta, Peralta was picking an argument with Luna. Luna's brother Augustin tried to stop the argument because Luna was a minor and Peralta was older than Luna. Maria Peralta tried to get her uncle to leave. Peralta did not want to leave. He wanted to wait for Pena, who was still at work, so he could fight him. As Peralta argued with Augustin, Luna retrieved a gun, pointed it at Peralta, and told him to leave.

About three weeks prior to the shooting, in January 2010, Peralta and Pena had a disagreement of some kind and pushed each other. According to Reyes, who witnessed the disagreement, they were engaged in a heated exchange. When they were about to fight, Luna's father stepped in and asked Pena to leave. Apparently describing the same incident, Maria Peralta testified that the altercation went beyond just pushing, with her uncle and Pena punching each other. After someone broke up the fight, Peralta and Pena both left.

During the late afternoon or early evening on February 20, 2010, Silvia was at a family party at her mother's house. There, she received a call from Luna who said that he and Pena would pick her up. At approximately 7:00 p.m. or 8:00 p.m., Luna and Pena arrived at the party in Pena's burgundy Toyota Camry. Pena was driving.

After Silvia got into the car, either Pena or Luna asked her to buy bullets for them because they did not have identification and Toro did not want to buy the bullets for them. Silvia agreed to do so. Pena drove to a Big Five store. Pena and Luna told Silvia

4

to buy one box of .45-caliber bullets. Pena gave Silvia the money to pay for the bullets. Pena, Luna, and Silvia entered the store, and Silvia purchased a box of .45-caliber bullets. They then drove to Silvia's house.

After they arrived at Silvia's house, Silvia left to buy beer and cigarettes. When she returned, she saw Luna pull a .45-caliber gun from his waistband area and load its clip with the bullets she had purchased. When Luna finished loading the clip, he gave it to Pena. Pena put the clip in the gun and put the gun "on his waist." Luna also was armed with a .40-caliber gun.

That night, the Maravilla family was having a birthday party and family reunion. The Maravilla family lived near the intersection of 92nd Street and Graham Avenue. Manuel Maravilla (Maravilla) and Augustin, Luna's brother, who was related to the Maravilla family by marriage, were present at the party.

At some point that night, Pena received a phone call from Luna's brother Augustin. Pena put the call on speaker. Silvia heard Augustin say that Peralta was at Augustin's location and that Pena should come over and "handle some shit." Augustin told Pena to "bring the .45." Pena said, "All right," and hung up. At some point Pena and Luna left the house. Silvia acknowledged that she told Los Angeles Police Department Detective Mark Hahn that Augustin said to Pena, "Hey come over here, [Peralta] is over here. Come handle some shit." She also acknowledged that she told Detective Hahn that Augustin told Pena to "bring the .45 to see if it works."

At some point, Irma's mother brought Irma and Jimenez home from the party at her (Irma's mother's) house. While Irma, Silvia, and Jimenez were at the house, Silvia answered a call from Luna on Jimenez's phone. Silvia put the call on speaker. Silvia heard guys laughing and recognized the voices of Augustin, Luna, and Pena. Luna told Silvia to stay on the phone.

Silvia heard Peralta tell Pena to not do anything because he was his "brother" and his "homie." Peralta also told Pena that he loved him. Immediately thereafter, Pena said, "Fuck that," and Luna said, "Do this nigga." Then, Silvia heard five gunshots. Next, Silvia heard sounds that indicated to her that Pena and Luna were driving in a car, and

5

she heard Pena tell Luna to slow down because he was driving too fast. Pena and Luna returned to Silvia's house about five minutes later.

Around 9:30 p.m. on February 20, 2010, Shaqwetta Turner was at her sister's baby shower at an apartment complex near 9226 South Graham Avenue in Los Angeles. She heard several gunshots and went out to the balcony to check on her two young children who were downstairs. Turner heard an additional shot and saw a man shoot Peralta from a distance of three and a half to four feet. She saw two persons in hoodies, one of whom was armed with a black gun. The person with the black gun shot Peralta. After Peralta was shot, the two persons ran away. Turner called 911.

Carolyn Williams lived in an apartment building at 9226 South Graham Avenue. About 9:30 p.m., she was outside of her building when she heard voices that sounded as if they might be arguing. She saw three persons across the street walking down the sidewalk—Maravilla, Peralta, and a third person. Williams heard a gunshot and saw the person other than Maravilla fire a shot at Peralta. Peralta ran and the shooter followed. The shooter fired additional shots. After the shooting, the shooter got into a red or burgundy car and drove away, turning on 92nd Street. There was another person in the car.

Evelyn Mejia also lived in the apartment building at 9226 South Graham Avenue. She heard three to four gunshots and dropped to the floor. When the shooting stopped, she looked out her window and saw a man running to a red car. Mejia identified Pena in a six-pack photographic lineup as the man she saw running to the car.

A deputy medical examiner from the coroner's office testified that Peralta suffered three gunshot wounds—two to his back, and one to his head. One of the gunshot wounds to his back was fatal. There were holes in the shoulder of Peralta's clothes that suggested that another shot was fired at Peralta that did not hit him, but only hit his clothes.

When Pena and Luna returned to Silvia's house, they told her to keep the lights off. Jimenez heard Pena say to Luna that he did not regret shooting Peralta and he would do it again if necessary. Pena asked Jimenez to show him how to cross the border to

6

"T.J." She agreed. Silvia, who was planning to visit her grandmother in "T.J.," joined them.

That night, Pena made arrangements for his brother to drive him, Luna, Silvia, and Jimenez part of the way to Pena's sister's house in Escondido. During part of the trip, Pena told his brother that he had a problem with someone who wanted to kill him, and he shot and killed that person. Pena's sister and her boyfriend met Pena and his companions at a gas station near the 91 Freeway in Los Angeles and drove them to a restaurant near the border with Tijuana, Mexico.

Pena, Luna, Silvia, and Jimenez crossed the border into Tijuana. Jimenez returned home after about two weeks, and Luna and Silvia returned home after about three weeks. When Irma next saw Luna, about one month after the shooting, he told her that he was the shooter. Because Luna always lied, she did not believe him.

Pena took a leave of absence from his work at Liberty Glass in Corona from February 19, 2010, his last day of work, to April 15, 2010. On June 10, 2010, Detective Hahn went to Liberty Glass. Pena was a suspect and Detective Hahn had information that Pena was working at Liberty Glass. That same day, Pena quit his job at Liberty Glass, stating that he had an emergency and needed to leave the country.

According to Detective Hahn, Peralta had two guns registered to him. Peralta's body was searched at the scene, and no weapons were found on him. A car registered to Peralta's sister was found nearby. No weapons were found in the car. Later, Peralta's brother found Peralta's guns in a drawer at the house they shared.

## II. Evidence Presented Only to Pena's Jury

Silvia testified that Luna and Pena returned to her home after she heard five gunshots on her cell phone. Once there, Pena said to her, "two bullets had got stuck."

Detective Hahn testified that Pena was a member of the Watts Varrio Grape street gang. Los Angeles Police Department Officer Carlos Lozano, the prosecution's gang expert, testified that he believed that Peralta's shooting was committed for the benefit of the Watts Varrio Grape gang.

Detective Hahn and his partner interviewed Pena when Pena was arrested. Pena said that he drove Luna to the location of the shooting in his brother's burgundy Toyota Camry. After initially denying that he knew Peralta, Pena said that they had been friendly, but "there were problems" and that they were not getting along prior to the shooting. Pena related examples of prior conflict, including an incident during which Pena struck Peralta, causing Peralta to fall to the ground. In that incident, Pena thought that Peralta, who was a security guard, was reaching for a gun. Peralta left and came back, saying that he was going to get Pena. Peralta pulled out a .9 millimeter handgun with which he began hitting Luna's door. Pena told the officers that he had heard that Peralta wanted to kill him.

Pena said that Augustin, a Grape Street gang member, called him and told him to go to the party on Graham Avenue and that Peralta was going to be there. Augustin and Peralta did not get along. Pena had his phone on speaker, and Augustin spoke to Pena and Luna. According to Pena, Peralta was not a Grape Street member. When Peralta was drunk, he claimed that he was a member of the East Coast Crips.

The day following Pena's arrest, Detective Hahn and his partner interviewed Pena again. A video recording of the interview was played for the jury. Pena said that he and Luna were drinking with the girls who "used to live in the back" when Augustin called. Pena put the call on speaker. Augustin said to "go over there" because it was Maravilla's mother's birthday. He said that Peralta would be there. Luna looked at Pena and then went to his house at the front of the property. Luna returned with .40- and .45-caliber guns. Luna loaded one of the guns. Pena initially picked up the .40-caliber gun, but then put it down. According to Pena, Luna always carried the .45-caliber gun.

Pena said that Luna drove them to Graham Street in a Toyota Camry. Peralta arrived about 30 minutes later. When Peralta got out of his car, people at the party expressed their belief that there would be a fight between Peralta and Pena. Peralta shook hands with "everybody" at the party. When he reached Pena, Peralta attempted to push Pena, but Pena moved out of the way. Luna began "talking shit" to Peralta. Augustin and Maravilla tried to get Pena to fight with Peralta. Pena walked to his car. Pena heard

8

five or six gunshots. He turned and saw that Luna had shot Peralta. Peralta tried to run to his car. Luna chased after him and continued to shoot. Peralta fell to the ground.

Pena and Luna left the scene. Pena drove them to Luna's house. Luna's father had been informed of the shooting by the time Pena and Luna arrived at Luna's house. Luna's father "talked shit" to Luna and Pena and told Pena to leave and that he had just "fucked up" his life.

Pena, Luna, Silvia, and her friend went to "TJ." When they reached a hotel in "TJ," Luna told Silvia and her friend that he had shot Peralta. Toro "got rid" of the guns. Pena remained in "TJ" for four or five months, and Luna remained three or four months. Pena did not come forward and tell the police what had happened because he was afraid.

### III.    Evidence Presented Only to Luna's Jury

Silvia testified that prior to the shooting, there was "bad blood, or bad dealings" between Peralta and Luna or Pena. There was an incident between November 2009, and February 2010, when Luna and Peralta were at a gathering outside Silvia's house when Peralta, who was drunk, tried to take Luna's seat on a couch by pulling Luna off the couch by his chain. Peralta then poured a beer on Luna's head. Luna pulled out a gun, and Peralta told Luna's father. Luna's father took the gun from Luna.

On August 17, 2011, Luna was arrested. Luna was taken to a police station where Detective Hahn and his partner interviewed him. A video recording of the interview was played for the jury. Luna told the detectives that he always got along with Peralta and did not have a problem with him. They never had an argument or a fight. He did not know what happened to Peralta. He denied that he was friends with Pena. Luna denied that he was present at Maravilla's house or involved in the shooting. Luna also denied that he had ever touched or loaded a ".45," or that he had loaded bullets into a magazine or clip.

Later in the interview, Luna admitted that "we [were] there," but said he had left by the time of the shooting. When pressed, Luna said, "I didn't want it to happen. I didn't help nobody, and I didn't do it." Luna said that he went to Tijuana right after the shooting because Irma invited him; he did not know that Peralta had been killed. When

9

they were in Tijuana, Pena told Luna, "I just put in some work." Luna understood Pena to mean that he shot somebody. Luna returned home the next day.

Detective Hahn played for Luna a video recording of Pena in which Pena said that Luna "did it." Luna said that he was at the scene earlier, but was not present when Peralta was shot. He was told that Pena shot Peralta. As the interview was ending, Luna asked where Pena was at that moment. Detective Hahn told Luna that he would not divulge Pena's whereabouts. Luna said, "I wish he was here right now so I could beat the dog shit out that nigga. I'm gonna tell you that, for real" Detective Hahn asked, "Why?" Luna responded, "'Cause that motherfucker should take responsibility for his own action."

A video recording of a second interview of Luna was played for the jury. Luna said that he was at the Maravilla house for a family get together. At some point, Peralta and Pena arrived and started arguing in the middle of the street. Peralta and Pena pointed at and pushed each other as if they were about to fight. Peralta tried to hit Pena, and Pena grabbed Peralta and shot him. Peralta tried to run, and Pena kept shooting at him. Pena ran away. Luna heard about eight shots.

Later, Pena showed up at the Luna house and said that he was "going to go over the border." Pena begged Luna to go to the border with him. Pena's brother drove them to the border. Luna intended to walk with Pena across the border. Pena's sister was supposed to wait for Luna and take him home, but she left. Luna spent the night and returned home the next day.

## IV.   Pena's Defense

Pena, who was 31 years old at the time of trial, testified that he joined the Grape Street gang when he was 14 years old and left the gang when he was 24 years old. Pena testified that he and Peralta had a confrontation at Luna's house about three months before the shooting. Peralta, who was drunk, "flipped out" and snatched some seeds from Luna's hand. Peralta called Luna a bitch. Pena interceded and told Peralta to relax. Peralta became more "violent," and said "bad words" to Pena. Pena punched Peralta,

10

knocking him to the floor.  Luna's father escorted Peralta out of the house and off of the property.  Peralta returned, said he was going to "fuck up" Pena, and pulled out a firearm.  Peralta told Pena to come outside and that he was going to kill Pena.

A few weeks after the incident at Luna's house, Maria Peralta called Pena because Peralta was "coming after" Pena.  Maria Peralta said that Peralta was "right there" waiting for Pena.  The call made Pena nervous.  Pena heard from others about threats from Peralta that he was going to "get" Pena.  Pena did not go to the police and report that he was afraid for his life because he did not think "it was going to escalate to this."

When Pena and Luna went to the party at the Maravilla residence, Peralta argued with Luna.  Pena told Peralta, who appeared to be drunk, to leave Luna alone.  Augustin, who also was present, told Luna to go to the car.  Pena and Luna began walking to their car.  Peralta followed, screaming.  Peralta grabbed Pena and threw him against a fence.  Peralta was on top of Pena and Pena could not push Peralta off.  Peralta called Pena a bitch.  Somebody yelled, "Hey."  Peralta "kind of turned around," and Pena shot him twice.  Peralta was in his work uniform, and Pena thought that Peralta was armed and was going to pull his gun and kill Pena.  The first shot hit Peralta in the head, the second in the neck.  Peralta did not "go down," but he let go of Pena who fell to the ground.  Pena tried to get up, but Peralta grabbed him again.  Pena thought that Peralta was going to kill him, so he shot him twice more.  Again, Peralta did not "go down," but turned and ran.

## V.     Luna's Defense

At the time of the shooting, Luna was 15 years old and was in eighth grade.  Luna was friends with Pena and Peralta.  When Peralta drank a lot, he became violent—he would get mad easily, scream, and "flip out."  Peralta had always been like that.

Luna never had any real problems with Peralta.  He denied there was an incident when Peralta pulled on his chain or that he ever pulled a gun on Peralta.  The incident when Peralta snatched seeds from his hand occurred four to five months prior to the shooting.  According to Luna, Peralta was drunk and snatched sunflower seeds from his hand.  Juan Pablo and Pena tried to calm Peralta.  Peralta called Pena names and cursed at

him. Pena punched Peralta, and Luna's father escorted Peralta out of the house. Peralta, who was armed with a gun, returned and called for Pena to come outside. Peralta remained outside for an hour or an hour and a half. Pena stayed in the house. Luna had seen Peralta armed with a .9 millimeter gun many times.

Between the sunflower seed incident and Peralta's shooting, Peralta returned to the Luna house on a number of occasions. Luna did not harbor ill-will for Peralta based on the incident, and "things were the same" between Luna and Peralta on those occasions. Luna was aware that there was bad blood between Pena and Peralta.

On the night of the shooting, Luna was hanging out with Pena and Silvia in the back house. Luna did not go with Pena and Silvia to buy bullets. Luna did not take a .45-caliber gun to Silvia's house. Pena received a call from Luna's brother Augustin. Augustin invited Pena to a family gathering or party at the Maravilla residence. Luna did not hear his brother tell Pena to come over "to take care of some shit" because Peralta was there and to bring the ".45."

Luna accompanied Pena to the Maravilla gathering. They drove in Pena's burgundy Toyota. Luna did not "see" whether Pena was armed. After they parked, and as Luna approached the Maravilla residence, Peralta started screaming at Luna and called him a bitch. Peralta appeared to have been drinking and was very angry. Pena pulled Luna away, and Augustin told Luna to go to the car. Luna walked to the car.

At the car, Luna saw Peralta and Pena exchange words. Peralta then slammed Pena into a gate. After Pena was slammed into the gate, Luna's view of the incident was obscured by parked cars. Next, Luna heard five gunshots and saw Peralta fall. Pena returned to the car. Luna did not see Pena with a gun. Pena and Luna returned to Luna's house. There, Pena told Luna that he shot Peralta and asked Luna to go with him to Tijuana.

Later that night, Luna, Pena, Silvia, and Jimenez went to Tijuana. Luna went to Tijuana "just to go." He was not running away from anything. There was never a plan for Pena to kill Peralta. Luna denied that he did or said anything to encourage Pena to shoot Peralta, or that he loaded or provided Pena with a gun on the night of the shooting.

Luna denied that he shot Peralta or that he told Irma that he shot Peralta. He admitted that he initially lied to Detective Hahn in the taped interview when he said the shooting had nothing to do with him. He lied because he was scared.

The parties stipulated that at the time of Peralta's death, his blood alcohol content measured .12. Peralta's blood tested positive for marijuana.

## DISCUSSION

### I.   Sufficiency of Evidence in Support of Luna's Murder Conviction

Luna contends that his murder conviction must be reversed because there is insufficient evidence that he aided and abetted Pena in Peralta's murder. His conviction, he asserts, was based primarily on the largely uncorroborated testimony of Silvia, an unreliable witness.

#### A.   *Standard of Review*

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 701.) "We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence. [Citation.]" (*People v. Medina* (2009) 46 Cal.4th 913, 919.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "Substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom." (*People v. Ugalino* (2009) 174 Cal.App.4th 1060, 1064.) "We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' [Citation.]" (*People v. Zamudio, supra,* 43 Cal.4th at pp. 357-358.) In determining whether substantial evidence supports

13

a conviction, "we do not reweigh the evidence, resolve conflicts in the evidence, draw inferences contrary to the verdict, or reevaluate the credibility of witnesses." (*People v. Little* (2004) 115 Cal.App.4th 766, 771, citing *People v. Jones* (1990) 51 Cal.3d 294, 314.)

        B.       *Application of Relevant Principles*

Luna contends that Silvia's testimony is insufficient evidence to support his murder conviction because it conflicted with Pena's testimony in a number of areas: Pena testified that he owned and loaded the .45-caliber gun; he did not hear Luna say, "Just do this nigger," or otherwise encourage him to shoot Peralta; and Luna did not give him the gun, load the gun, drive the car, or shoot Peralta. Further, Silvia's testimony was untrustworthy because she admitted that she lied to the police during their investigation, she was drinking and smoking marijuana on the day of the shooting, she used a "substantial amount of methamphetamine on a daily basis for four months after she returned from Mexico," she had a motive to lie about Luna because she believed that he had been violent to her sister Irma on two occasions, and she had a motive to implicate Luna because she could have been considered an accomplice by her purchase of the .45-caliber bullets. Moreover, Luna contends, only Jimenez corroborated Silvia's testimony that Luna said that Peralta was near a pole in his call to Silvia that she put on speaker, and Jimenez testified that she did not hear anyone say during that call, "I don't give a fuck," or "Just do this nigger." Irma, who was also present for the speaker call, did not hear Luna or anyone say, "Just do this nigga," or anything similar, and she did not hear Pena tell Luna to slow down. In his argument, Luna asks this court to resolve conflicts in the evidence adduced at trial and to make a determination about Silvia's credibility. As stated above, "we do not reweigh the evidence, resolve conflicts in the evidence, draw inferences contrary to the verdict, or reevaluate the credibility of witnesses" in determining whether substantial evidence supports a conviction. (*People v. Little, supra,* 115 Cal.App.4th at p. 771, citing *People v. Jones, supra,* 51 Cal.3d at p. 314.) Accordingly, Luna's argument fails.

**II. The Luna Jury's Deliberations and Verdict While a Jury Question Was Still Pending Before the Trial Court**

Luna argues that the trial court violated section 1138 when it permitted the jury to continue deliberations and reach a verdict before it answered a jury question.[6] Because Luna did not object in the trial court, he has forfeited review of this issue.

*A. Background*

During jury deliberations, Judge Paul A. Bacigalupo sat in for Judge Arthur M. Lew, who presided over the trial. At 9:15 a.m. on August 10, 2012, the jury submitted the following question to Judge Bacigalupo: "When Bobby Nestor Luna fled to Mexico with defendant Domingo Pena, was that considered 'during the commission [of] the crime?'" When Judge Bacigalupo addressed the jury's question, neither the trial prosecutor nor defense counsel was present in the courtroom—each was represented by substitute counsel. Judge Bacigalupo stated that he had just spoken with trial prosecutor and defense counsel "so they were participating telephonically within the presence of their colleagues."

Judge Bacigalupo stated that it was difficult for him to answer the question as he was not the trial judge. He stated, "the prosecution was arguing or relying heavily on the flight instruction, and the defense lawyer was indicating that she believed the quoted language was coming specifically from the aiding and abetting instruction. Neither of them had any direct discussion on how to answer it, to the extent neither could agree on how to do so." Judge Bacigalupo stated that he would wait to speak to Judge Lew for his input before answering the question. Judge Lew would be available that morning. The jury was informed that its question was "under review."

At 11:30 a.m., the jury informed the bailiff that it had reached a verdict and no longer needed an answer to its question. The parties were contacted and ordered to

---

**6**    Respondent did not address this issue in its brief. Luna contends that we should construe the omission as a concession of the merits of his argument. Instead, we construe the omission as an oversight.

appear at 1:30 p.m.  When the trial reconvened before Judge Bacigalupo, the trial prosecutor and defense counsel were represented by substitute counsel.  Judge Bacigalupo asked the foreperson if the jury still needed a response to its question.  The foreperson responded, "No, it was not needed."  Judge Bacigalupo then took the jury's verdict.

### B.      Application of Relevant Principles

Section 1138 provides:  "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court.  Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

"A defendant may forfeit an objection to the court's response to a jury inquiry through counsel's consent, or invitation or tacit approval of, that response.  (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193 [36 Cal.Rptr.2d 235, 885 P.2d 1] ['Inasmuch as defendant both suggested and consented to the responses given by the court, the claim of error has been waived.']; *People v. Hughes* (2002) 27 Cal.4th 287, 402 [116 Cal.Rptr.2d 401, 39 P.3d 432] [claim of error was 'waived by defense counsel's agreement with the trial court that informing the jury of the consequences of a deadlock would have been improper']; *People v. Bohana* (2000) 84 Cal.App.4th 360, 373 [100 Cal.Rptr.2d 845] [counsel invited and consented to failure to instruct on lesser offenses in response to jury inquiry]; *People v. Thoi* (1989) 213 Cal.App.3d 689, 698 [261 Cal.Rptr. 789] [error invited or waived, where counsel 'actively and vigorously lobbied against further instruction']; *People v. Kageler* (1973) 32 Cal.App.3d 738, 746 [108 Cal.Rptr. 235] [where clarification would have adversely affected defense, failure to object had possible tactical motive and could be viewed as "'tacit approval'"].)  But this rule obviously cannot apply unless it appears that counsel was aware of the court's response at or before the time it was effected.  'Tacit approval' of the court's response, or lack of response,

16

may be found where the court makes clear its intended response and defense counsel, with ample opportunity to object, fails to do so. (See *People v. Boyette* (2002) 29 Cal.4th 381, 430 [127 Cal.Rptr.2d 544, 58 P.3d 391].) At its furthest reach the rule has been held to justify a forfeiture where defense counsel sat mute while the court provided a response later challenged on appeal. (*People v. Roldan* (2005) 35 Cal.4th 646, 729 [27 Cal.Rptr.3d 360, 110 P.3d 289], disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)" (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1048.)

Substitute defense counsel was aware that under Judge Bacigalupo's stated approach to answering the jury's question, the jury would be permitted to deliberate during the period before Judge Bacigalupo was able to confer with Judge Lew. Substitute defense counsel did not object. When the jury returned its verdict and the foreperson informed the bailiff and Judge Bacigalupo that the jury did not need an answer to its question, substitute defense counsel again did not object. Accordingly, Luna's claim that the trial court violated section 1138 was forfeited by substitute defense counsel's failure to object in the trial court. (See *People v. Ross, supra,* 155 Cal.App.4th at p. 1048.)

### C.   *Ineffective Assistance of Counsel*

Luna argues that if this issue has been forfeited, then defense counsel[7] provided ineffective assistance of counsel. Luna contends that reasonably competent defense counsel would have argued to Judge Bacigalupo that the proper answer to the jury's question about whether Luna's flight to Mexico with Pena was considered during the commission of the crime was "no," and would have objected to the jury deliberating  or rendering a verdict before receiving that answer.

"When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction

---

**7**    We assume that Luna's claim concerns both trial defense counsel and substitute defense counsel. In our analysis, we will use the term "defense counsel" to refer to both trial and substitute defense counsel.

must be affirmed unless there could be no satisfactory explanation. [Citation.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) "A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.) The record on appeal does not reveal the reason why defense counsel failed to object to the jury continuing deliberations while Judge Bacigalupo waited to confer with Judge Lew. It may be that defense counsel did not object because section 1138 does not by its terms require a trial court "to stop jury deliberations while the court determines what definition or further explanation of a point of law is appropriate in response to a question it has exercised its discretion to answer [citation] . . . ." (*People v. McCleod* (1997) 55 Cal.App.4th 1205, 1220.) Defense counsel may not have objected when the jury informed the trial court that it had reached a verdict before Judge Bacigalupo answered its question because defense counsel believed that an objection was unnecessary as the jury had informed the bailiff and the trial court that it did not need an answer to its question—that is, that the jury had resolved the question. There is no way of determining why defense counsel failed to object. Accordingly, any claim of ineffective assistance with respect to the claimed deficiencies is better suited to a petition for writ of habeas corpus. (*People v. Anderson, supra,* 25 Cal.4th at p. 569; *People v. Mendoza Tello, supra,* 15 Cal.4th at p. 267.)

### III. Jimenez's Preliminary Hearing Testimony

Defendants contend that the trial court violated their federal and state constitutional rights to confront a witness against them when it permitted the prosecution to read Jimenez's preliminary hearing testimony. Defendant's argue that the prosecution failed to show that it exercised due diligence in securing Jimenez's presence at trial. The trial court did not err.

#### A. Background

At the trial in this case, the juries were sworn on July 19, 2012, and the first witness testified on July 20, 2012. On Monday, July 30, 2012, the prosecutor informed

the trial court that Detective Hahn had personally served Jimenez with a subpoena and placed her on call. On July 27, 2012, Detective Hahn went to Jimenez's mother's home, left his business card with Jimenez's mother, and told Jimenez's mother that Jimenez was "needed on Monday." Because Jimenez failed to appear and was not at her mother's home, the prosecutor requested, and the trial court issued, a $50,000 body attachment for Jimenez.

On July 31, 2012, the trial court held a due diligence hearing concerning the prosecution's efforts to secure Jimenez's presence at trial. Detective Hahn testified that on July 3, Jimenez's mother, Alicia Morales, told him that she did not have a phone number for Jimenez and did not know where she was staying. On July 4, Jimenez told Detective Hahn that she had been staying at a friend's house in Pasadena. Jimenez gave the detective the friend's name and identified the street the friend lived on, but she did not have the friend's exact address and did not want to provide the friend's phone number without her friend's permission. Jimenez did not want her friend to know she had been going to court as she might be perceived of as a "snitch."

On July 5, Detective Hahn left a trial subpoena for Jimenez at her mother's home. The subpoena required Jimenez to appear on July 10. Previously, Detective Hahn had served a preliminary hearing subpoena on Jimenez at Morales's home. Jimenez appeared and testified at the preliminary hearing. On July 6, Detectives Hahn and Gutierrez met with Jimenez at Broadway and Gage, where they personally served her with a copy of the trial subpoena. Detective Hahn explained to Jimenez that she did not have to appear on July 10, but would be on call for the duration of the trial. Jimenez said that she would be staying at her mother's home until the trial ended. Detective Hahn told her that he would contact her there when she was needed. He said that he would let her know the day before she was needed in court.

On July 23, Detective Hahn went to Morales's home to speak to Jimenez. He located her outside of her mother's home. He reminded her that she was on call, that the case was proceeding in court, and that he would let her know when she was needed. Jimenez appeared to understand and agree to the "continued service of the subpoena."

At noon on Friday, July 27, Detective Roberto Bourbois went to Morales's home to try to locate Jimenez. Morales told the detective that Jimenez had not been home and that she did not know when she would be home. At 5:00 p.m. that evening, Detective Bourbois returned with Detective Hahn. Morales told the detectives that Jimenez had not been home after Detective Bourbois's noon visit. Detective Hahn left a business card that told Jimenez that she would be picked up at 8:00 a.m. the following Monday.

When Detective Hahn arrived at the Morales home on Monday morning, July 30, Jimenez was not there. Morales told Detective Hahn that Jimenez had been there on Saturday, and that Jimenez was aware of the business card he left indicating that she was needed for testimony on July 30. Morales did not know where Jimenez had gone.

Detective Hahn waited for 45 minutes for Jimenez to show up. He then drove around the neighborhood looking for her. He was unsuccessful. He contacted a fellow detective who conducted a computer search to determine if Jimenez was in custody, if she had changed her address with the DMV or on her California I.D. card (which listed her mother's address), or if she had recently had received a ticket or reported a crime. The computer search was unsuccessful.

Detective Hahn had information from Jimenez, obtained on July 6, that she had a boyfriend who lived in the area of 112th and Compton Avenue. At that time, Jimenez did not have her boyfriend's exact address, but only the intersection where he lived. Detective Hahn did not later attempt to find out the exact address. Detective Hahn searched the area of 112th and Compton Avenue for Jimenez without success. Detective Hahn also had information that Jimenez previously lived two doors east of her mother's home. He checked that location, but the residents said that Jimenez no longer lived there.

Detective Hahn had a cell phone number for Jimenez that she had given him on July 6. The number, however, was no longer in service. Detective Hahn explained Jimenez had said that her mother had obtained the phone from the government, she believed the phone had minutes on it, and she would attempt to charge it.

About 6:10 p.m., after the trial court issued the body attachment order for Jimenez, Detective Hahn returned to Morales's home. Jimenez was not there, but Morales

20

informed the detective that her daughter had been there between 2:00 and 3:00 p.m. that afternoon. Morales said that Jimenez had been made aware that she was needed in court. She said that she gave Jimenez Detective Bourbois's business card, which included his cell phone number. Morales was "agreeable to call Detective Bourbois without [Jimenez]'s knowledge in order for detectives to come and be able to locate her."

About 7:40 a.m. on July 31, the morning of the due diligence hearing, Detective Bourbois called Morales. Morales said that Jimenez had not come home and Morales had not seen or spoken with Jimenez since the previous day. An hour later, after searching for Jimenez in the area around her boyfriend's residence and in Morales's neighborhood without success, Detective Bourbois and another detective spoke with Morales. Morales said that Jimenez had not contacted her in the hour since Detective Bourbois's earlier phone call. Detective Hahn conducted a computer search for Jimenez's address without success. At the time of his testimony at the due diligence hearing, Detective Hahn had not received information from Morales that she had seen Jimenez.

Detective Hahn testified that he put Jimenez on call even though he did not have a "good solid number or address" for her because of his history with her. When he reached out to her in the past through her mother, she would call him, and she did not show an unwillingness to testify.

The trial court ruled that the prosecution had used reasonable due diligence to secure Jimenez's presence at trial. Substantially all of Jimenez's preliminary hearing testimony was read to the jury.[8]


### B.     Standard of Review

When, as here, the facts concerning the prosecution's efforts to locate an absent witness are not in dispute, we "independently review [the] trial court's determination that the prosecution's failed efforts to locate [the] absent witness are sufficient to justify an

---

[8]     The prosecution did not read to the jury preliminary hearing testimony to which objections had been sustained.

exception to the defendant's constitutionally guaranteed right of confrontation at trial." (*People v. Cromer* (2001) 24 Cal.4th 889, 901.)

### C. Application of Relevant Principles

"The confrontation clauses of both the federal and state Constitutions guarantee a criminal defendant the right to confront the prosecution's witnesses. (U.S. Const., 6th Amend.; Cal. Const. art. I, § 15.) That right is not absolute, however. An exception exists when a witness is unavailable and, at a previous court proceeding against the same defendant, has given testimony that was subject to cross-examination. Under federal constitutional law, such testimony is admissible if the prosecution shows it made 'a good-faith effort' to obtain the presence of the witness at trial. (*Barber v. Page* (1968) 390 U.S. 719, 725 [88 S.Ct. 1318, 1322, 20 L.Ed.2d 255]; accord, *Ohio v. Roberts* (1980) 448 U.S. 56, 74 [100 S.Ct. 2531, 2543, 65 L.Ed.2d 597], overruled on other grounds by *Crawford v. Washington* (2004) 541 U.S. 36.) California allows introduction of the witness's prior recorded testimony if the prosecution has used 'reasonable diligence' (often referred to as due diligence) in its unsuccessful efforts to locate the missing witness. (Evid. Code, § 240, subd. (a)(5) . . . .)"[9] (*People v. Cromer, supra,* 24 Cal.4th at p. 892.)

"Reasonable diligence" or "due diligence" under Evidence Code section 240, subdivision (a)(5) "'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.' [Citations.]" (*People v. Cromer, supra,* 24 Cal.4th at p. 904.) Whether a prosecutor has exercised due diligence to secure a witness's presence at trial depends on the facts of the case. (*People v. Sanders* (1995) 11 Cal.4th 475, 523.) We consider the totality of the prosecutor's efforts to secure the witness's presence. (*Ibid.*) We take into consideration such factors as whether the prosecutor began the

---

**9** Evidence Code section 240, subdivision (a)(5) provides that a declarant is unavailable as a witness if the declarant is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process."

search timely and whether the witness's presence could have been obtained if the prosecutor had exercised reasonable diligence. (*Ibid.*) "The prosecution is not required 'to keep "periodic tabs" on every material witness in a criminal case . . . .' [Citation.] Also, the prosecution is not required, absent knowledge of a 'substantial risk that this important witness would flee,' to 'take adequate preventative measures' to stop the witness from disappearing. [Citation.]" (*People v. Wilson* (2005) 36 Cal.4th 309, 342.)

The prosecution used reasonable diligence to secure Jimenez's presence at trial. Prior to trial, the prosecution subpoenaed Jimenez for the preliminary hearing by delivering the subpoena to her mother's home. Jimenez testified at the preliminary hearing, thus demonstrating her willingness to testify despite any reluctance. On July 5, prior to trial, Detective Hahn left Jimenez's trial subpoena at her mother's home. He personally served Jimenez with a copy the next day and told her she would be on call until the end of the trial. Jimenez told the detective that she would be staying at her mother's home until the trial ended. On July 23, Detective Hahn reminded Jimenez that she was on call and she appeared to understand and agree to her on-call status.

The Friday before Jimenez's Monday scheduled testimony, detectives twice tried to contact Jimenez in person at her mother's home. Unable to do so, they left a business card informing her that she would be picked up at 8:00 a.m. on Monday. When Detective Hahn went to the Morales home on Monday and determined that Jimenez was not there, he first waited 45 minutes for her to show up and then began a search for her. He drove around Morales's neighborhood looking for Jimenez, checked an old address Jimenez had in the neighborhood, and searched for Jimenez in her boyfriend's neighborhood. He also caused another detective to perform a computer search for possible leads to Jimenez's whereabouts. Detective Hahn also checked a cell phone number Jimenez had given him.

Detective Hahn returned to Morales's home after court on Monday. Although Jimenez was not there, Detective Hahn learned that Morales had been in touch with Jimenez and that Jimenez had been made aware that she was needed in court. Morales apparently agreed to call Detective Bourbois without her daughter's knowledge if

23

Jimenez again appeared at Morales's home. The next morning, Detective Bourbois called Morales in an effort to find Jimenez. He then conducted another search for Jimenez in the area around her boyfriend's residence and in Morales's neighborhood. Another computer search was conducted. Because Jimenez was not a flight risk, she had given Detective Hahn the address where she would be staying during the trial—her mother's home—the place where Detective Hahn served her preliminary hearing subpoena, the prosecution launched a reasonable search for her after Detective Hahn allowed for a short period—45 minutes—for her to show up at her mother's home, and the prosecution continued to search for her up to the time of the due diligence hearing, the trial court did not err in determining that the prosecution used due diligence to secure her presence at trial. (*People v. Sanders, supra,* 11 Cal.4th at p. 523.)

Luna contends that Detective Hahn should not have placed Jimenez on call "unless and until she provided a valid address and phone number of the location where she was staying." Jimenez provided such information. She told Detective Hahn that she would be staying with her mother until the trial was over.

Pena claims that because Jimenez was an important witness, the prosecution should have conducted a surveillance of her in the week before she was needed to testify or taken other, unidentified, steps to secure her presence at trial. Jimenez's preliminary hearing testimony about Luna's speaker call from the scene of the shooting was largely cumulative of Silvia's testimony about that call. The prosecution was not required to keep tabs on Jimenez simply because she was a material witness in this case. (*People v. Wilson, supra,* 36 Cal.4th at p. 342.) Similarly, because there was no evidence that there was a "substantial risk" that Jimenez would not appear, the prosecution was not required to take steps to prevent Jimenez from disappearing. (*Ibid.*)

**IV. CALCRIM No. 570—Voluntary Manslaughter Based on a Sudden Quarrel or Heat of Passion**

Defendants contend that the trial court erred in failing to instruct their respective juries with CALCRIM No. 570[10] on voluntary manslaughter based on a sudden quarrel or heat of passion because substantial evidence supported the instruction. The trial court did not err.

---

[10] Unmodified, CALCRIM No. 570 provides:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

"The defendant killed someone because of a sudden quarrel or in the heat of passion if:

"1 The defendant was provoked;

"2 As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment;

"AND

"3 The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

"In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant simply was provoked. The defendant is not allowed to set up (his/her) own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

"[If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.]

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

## A. Background

Defendants requested the trial court to instruct their respective juries with CALCRIM No. 570 on voluntary manslaughter based on a sudden quarrel or heat of passion. The trial court denied Pena's request because Pena testified that he shot Peralta in self-defense, not because he was faced with a sudden quarrel or was in the heat of passion.[11] It is unclear from the record whether the trial court denied Luna's request to instruct his jury with CALCRIM No. 570 or whether it granted his request but failed to so instruct his jury. In any event, the trial court did not instruct Luna's jury with CALCRIM No. 570.

## B. Application of Relevant Principles

"'[I]t is the "court's duty to instruct the jury not only on the crime with which the defendant is charged, but also on any lesser offense that is both included in the offense charged and shown by the evidence to have been committed." [Citation.]' (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826 [89 Cal.Rptr.3d 225, 200 P.3d 847]; see *Beck v. Alabama* (1980) 447 U.S. 625, 637 [65 L.Ed.2d 392, 100 S.Ct. 2382].) 'Conversely, even on request, the court "has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction" [Citation.]' ([*People v.*] *Cole* [(2004)] 33 Cal.4th [1158,] 1215.) Substantial evidence 'is not merely "*any* evidence . . . no matter how weak" [citation], but rather "'evidence from which a jury composed of reasonable [persons] could . . . conclude [ ]'" that the lesser offense, but not the greater, was committed. [Citations.]' (*People v. Cruz* (2008) 44 Cal.4th 636, 664 [80 Cal.Rptr.3d 126, 187 P.3d 970].) "'On appeal, we review independently the question

---

[11] The trial court and Pena's counsel discussed, at the same time, Pena's requests that the trial court instruct the jury with CALCRIM No. 570 and CALCRIM No. 522 (provocation may reduce murder from first to second degree). In rejecting Pena's requests, the trial court referenced Pena's request to instruct his jury with CALCRIM No. 522. In context, it is clear that the trial court also rejected Pena's request to instruct his jury with CALCRIM No. 570. We discuss below the trial court's ruling on Pena's request that the trial court instruct his jury with CALCRIM No. 522.

whether the court failed to instruct on a lesser included offense." [Citation.]' (*People v. Avila* (2009) 46 Cal.4th 680, 705 [94 Cal.Rptr.3d 699, 208 P.3d 634].)" (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1327-1328.)

"[V]oluntary manslaughter based upon sudden quarrel or heat of passion requires a showing of adequate provocation, which has both a subjective and an objective component. (*People v. Steele* (2002) 27 Cal.4th 1230, 1252 [120 Cal.Rptr.2d 432, 47 P.3d 225].) The defendant must actually and subjectively kill under the heat of passion, but the circumstances giving rise to the heat of passion are also viewed objectively to determine whether the '"circumstances were sufficient to arouse the passion of the ordinarily reasonable man."' (*Id.* at pp. 1252-1253.)" (*People v. Gonzales and Solis* (2011) 52 Cal.4th 254, 301.)


### 1.       Pena

The prosecution's evidence showed that Augustin called Pena and told him that he should come to the Maravilla party because Peralta was there and he (Pena) should "handle some shit." Augustin advised Pena to bring his .45 caliber gun. On Luna's speaker call from the Maravilla party, Peralta was heard telling Pena to not do anything because he was his "brother" and his "homie." Peralta said he loved Pena. Pena responded, "Fuck that." Luna said, "Do this nigga," and five gunshots were fired. Such evidence demonstrated cold deliberation in Peralta's shooting, and not a shooting by a person subjectively influenced by a sudden quarrel or heat of passion. (*People v. Steele, supra,* 27 Cal.4th at p. 1252.)

In Pena's defense case, Pena testified that he interceded in the argument between Peralta and Luna at the Maravilla party. Peralta threw him against a fence and got on top of him. Pena shot Peralta twice because Pena thought that Peralta was armed and was going to pull his gun and kill Pena. When Peralta grabbed Pena again, Pena again thought that Peralta was going to kill him, so he shot Peralta twice more. That is, Pena testified that he shot Peralta in self-defense, which is not based on heat of passion. Thus, Pena's own testimony conclusively negated the subjective component of the sudden

27

quarrel or heat of passion theory of voluntary manslaughter—i.e., one who acts in self-defense does not actually and subjectively act under the heat of passion. (See *People v. Steele, supra,* 27 Cal.4th at p. 1252.)

There was not substantial evidence from which a reasonable juror could have concluded that Pena committed voluntary manslaughter based on a sudden quarrel or heat of passion and not murder. Thus, the trial court did not err in denying Pena's request to instruct his jury with CALCRIM No. 570. (*People v. Castaneda, supra,* 51 Cal.4th at pp. 1327-1328; *People v. Gonzales and Solis, supra,* 52 Cal.4th at p. 301.)

        2.     Luna

Luna contends that if we hold that there was sufficient evidence to support his murder conviction on an aiding and abetting theory (see Part I, above), then there was substantial evidence that Pena was provoked into shooting Peralta and he (Luna) was provoked into aiding and abetting Pena. In support of this argument, Luna recounts the history of conflict between Peralta and Pena and Luna and the circumstances surrounding Peralta's shooting. Luna testified that when he and Pena parked at the Maravilla party, Peralta started screaming at him and called him a bitch. Peralta appeared to have been drinking and was very angry. Pena and Augustin interceded, and Augustin told Luna to go to the car. From his vantage point at the car, Luna saw Peralta and Pena exchange words and Peralta slam Pena into a gate. Luna did not see what happened next as his view of the incident was obscured by parked cars. Luna denied that he did or said anything to encourage Pena to shoot Peralta.

Even assuming that Luna's account of his and Pena's history with Peralta and the circumstances surrounding Peralta's shooting was sufficient to establish the objective component of sudden quarrel/heat of passion voluntary manslaughter—i.e., the circumstances were sufficient to arouse the passion of the ordinarily reasonable man, there was no evidence from which a reasonable juror would have found the subjective component—that either Pena or Luna actually and subjectively acted under the heat of passion in shooting Peralta or in aiding and abetting in that shooting. Luna effectively

28

testified that he was not involved in Peralta's shooting at all. He did not testify that he assisted Pena in shooting Peralta due to passion he felt as a result of his or Pena's altercation with Peralta. Rather, he denied that he did or said anything to encourage Pena to shoot Peralta. Because there was not substantial evidence from which a reasonable juror could have concluded that Luna committed voluntary manslaughter based on a sudden quarrel or heat of passion and not murder, the trial court did not err in failing to instruct Luna's jury with CALCRIM No. 570. (*People v. Castaneda, supra,* 51 Cal.4th at pp. 1327-1328; *People v. Gonzales and Solis, supra,* 52 Cal.4th at p. 301.) Moreover, even if the facts warranted instructing Pena's jury with CALCRIM No. 570, they did not also necessarily warrant instructing Luna's jury with CALCRIM No. 570. (See *People v. McCoy* (2001) 25 Cal.4th 1111, 1122 [an aider and abettor's "guilt is determined by the combined acts of all the participants as well as that person's own mens rea. If that person's mens rea is more culpable than another's, that person's guilt may be greater even if the other might be deemed the actual perpetrator"].)

### C.  Harmless Error

Even if the trial court had erred in failing to instruct the juries on sudden quarrel/heat of passion voluntary manslaughter, any such error was harmless because "the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions." (*People v. Sedeno* (1974) 10 Cal.3d 703, 721, disapproved on other grounds in *People v. Breverman* (1998) 19 Cal.4th 142, 165.) The trial court instructed the juries with CALCRIM No. 521 on first degree murder. CALCRIM No. 521 told the juries, in part, that "A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." By finding that Peralta's murder was premeditated and deliberate, the jury necessarily decided that the shooting was not based on a sudden quarrel or a heat of passion. (*People v. Wharton* (1991) 53 Cal.3d 522, 572 ["By finding defendant was guilty of first degree murder, the jury necessarily found defendant premeditated and deliberated the killing. This state of mind, involving planning and deliberate action, is manifestly inconsistent

29

with having acted under the heat of passion—even if that state of mind was achieved after a considerable period of provocatory conduct—and clearly demonstrates that defendant was not prejudiced by the failure to give his requested instruction"]; *People v. Sedeno, supra,* 10 Cal.3d at p. 721.)

## V.  CALCRIM No. 522—Provocation May Reduce Murder From First to Second Degree

Pena claims that the trial court erred in denying his request that it instruct his jury with CALCRIM No. 522 that provocation may reduce murder from first to second degree.  The trial court did not err.

Pena requested the trial court to instruct his jury with CALCRM No. 522 that provocation may reduce murder from first to second degree.  The trial court denied the request, finding that Pena testified he shot Peralta in self-defense and not due to provocation.

CALCRIM No. 522 provides:

"Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter].  The weight and significance of the provocation, if any, are for you to decide.

"If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder.  [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.]

"[Provocation does not apply to a prosecution under a theory of felony murder.]"

"First degree murder is an unlawful killing with malice aforethought, premeditation, and deliberation.  (*People v. Chun* (2009) 45 Cal.4th 1172, 1181 [91 Cal.Rptr.3d 106, 203 P.3d 425].)  Malice may be express (intent to kill) or implied (intentional commission of life-threatening act with conscious disregard for life).  (*Ibid.*) Second degree murder is an unlawful killing with malice, but without the elements of premeditation and deliberation which elevate the killing to first degree murder.  (*Ibid.*)

30

To reduce a murder to second degree murder, premeditation and deliberation may be negated by heat of passion arising from provocation. (*People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295-1296 [3 Cal.Rptr.2d 808].) If the provocation would not cause an average person to experience deadly passion but it precludes the defendant from subjectively deliberating or premeditating, the crime is second degree murder. (*Ibid.*)" (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332.)

"The test of whether provocation or heat of passion can negate malice so as to mitigate murder to voluntary manslaughter is objective. [Citations.] . . . The test of whether provocation or heat of passion can negate deliberation and premeditation so as to reduce first degree murder to second degree murder, on the other hand, is subjective. [Citations.]" (*People v. Padilla* (2002) 103 Cal.App.4th 675, 678.)

Pena states that even if there was insufficient evidence to instruct on sudden quarrel/heat of passion voluntary manslaughter because the evidence did not show that a reasonable person *objectively* would have been provoked, "there was evidence that Pena *subjectively* was provoked into killing Peralta, even if that provocation was not reasonable." According to Pena, "Peralta's arguably provocative words and actions just prior to the shooting could have been seen as the tipping point that cause Pena to impulsively shoot and kill him." Thus, Pena contends, the jury could have rejected his testimony that he shot Peralta in self-defense and found instead that Peralta's conduct provoked him into shooting Peralta. As Pena states, the test for provocation is subjective. (*People v. Padilla, supra,* 103 Cal.App.4th at p. 678.) The only evidence concerning the subjective reason Pena shot Peralta was Pena's testimony that he shot Peralta because he believed Peralta was going to kill him—i.e., he shot Peralta in self-defense and not in the heat of passion. There is no evidence that Pena shot Peralta due to any provocative act by Peralta. "Adequate provocation as an element of voluntary manslaughter must be affirmatively demonstrated; it cannot be left to speculation." (*People v. Williams* (1969) 71 Cal.2d 614, 624.)

Moreover, as with the trial court's failure to instruct on sudden quarrel/heat of passion voluntary manslaughter, any error in failing to instruct Pena's jury on

31

provocation was harmless. As explained above, Pena's jury found him guilty of first degree murder—i.e., that he murdered Peralta with premeditation and deliberation. In so finding, the jury necessarily decided that the shooting was not based on provocation. (*People v. Earp* (1999) 20 Cal.4th 826, 886-887 [*People v. Watson* (1956) 46 Cal.2d 818, 836-837 standard applies to a trial court's denial of "pinpoint" instructions]; see *People v. Sedeno, supra,* 10 Cal.3d 703, 721; *People v. Wharton, supra,* 53 Cal.3d at p. 572.)

## VI. Constitutional Right to a Jury Instruction That the Prosecution Had to Prove the Absence of Heat of Passion as an Element of Murder

Luna argues that the trial court violated his constitutional right to due process when it failed to instruct his jury, sua sponte, that the prosecution was required to prove beyond a reasonable doubt the absence of heat of passion as an element of murder. He contends that neither CALCRIM No. 520[12] nor any other instruction "informed the jurors that a killing induced by heat of passion caused by adequate provocation would mean that the defendant had no malice—express or implied—and that therefor [he] could only be found guilty of voluntary manslaughter, rather than murder." The trial court did not err.

---

[12] Luna's jury was instructed with CALCRIM No. 520 as follows:

"The defendant is charged in count 1 with murder, in violation of Penal Code section 187. To prove that the defendant is guilty of this crime, the People must prove that, one, the defendant committed an act that caused the death of another person; and, two, when the defendant acted, he had a state of mind called malice aforethought; and, three, he killed without lawful excuse or justification.

"There are two kinds of malice aforethought: express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder.

"The defendant acted with express malice if he unlawfully intended to kill.

"The defendant acted with implied malice if, one, he intentionally committed an act; two, the natural-and-probable consequences of the act were dangerous to human life; three, at the time he acted, he knew his act was dangerous to human life; and, four, he deliberately acted with conscious disregard for human life.

"Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time.

"If you decide that the defendant committed murder, you must then decide whether it is murder of the first or second degree."

"[T]he Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." (*Mullaney v. Wilbur* (1975) 421 U.S. 684, 703.) Under *Mullaney v. Wilbur*, the prosecution is not required to prove the absence of heat of passion in every homicide case, only in those cases in which the issue is "properly presented." In *People v. Rios* (2000) 23 Cal.4th 450, the court explained that the issue is "properly presented" when "the People's own evidence suggests that the killing may have been provoked or in honest response to perceived danger" or when the defendant made a "showing on these issues sufficient to raise a reasonable doubt of his guilt of murder." (*Id.* at pp. 461-462.)

Luna's argument fails because the issue of whether Pena shot Peralta based on "heat of passion caused by adequate provocation" was not "properly presented" in this case. As explained above, Pena testified that he shot Peralta in self-defense and there was no evidence that either Pena or Luna actually and subjectively acted under the heat of passion caused by sufficient provocation in shooting Peralta or in aiding and abetting in Peralta's shooting. Accordingly, the prosecution was not required to prove beyond a reasonable doubt the absence of heat of passion as an element of murder, and the trial court did not err by failing sua sponte to so instruct the jury. (*People v. Rios, supra,* 23 Cal.4th at pp. 461-462.)

## VII.  CALCRIM No. 371

Pena contends that the trial court erred in instructing his jury with a modified version of CALCRIM No. 371 (Consciousness of Guilt:  Suppression and Fabrication of Evidence) that it could consider his conduct, if any, in hiding evidence as showing an awareness of guilt. Pena contends that substantial evidence did not support the instruction. Because Pena's counsel agreed to the instruction, he has forfeited review of this issue on appeal.

When discussing instructions, the prosecutor stated that he wanted the trial court to instruct Pena's jury with the "Alternative A—suppression" version of CALCRIM No.

33

371.**13**  The prosecutor requested the trial court to instruct with the part of the instruction that concerned a defendant's efforts to hide evidence based on "[t]he covering up the 187 [section 187 defines murder] tattoo on his trigger finger."  He requested the trial court to strike from the instruction the part that concerned discouraging someone from testifying.  Pena's counsel read the proposed version of CALCRIM No. 371 and said, "I'm just reading the rest of it.  It sounds okay.  I'm just reading the rest of it.  Yes, that's fine.  If we just strike out the words 'or discourage somebody to testify.'"

The trial court instructed Pena's jury with CALCRIM No. 371 as follows:  "If the defendant tried to hide evidence, that conduct may show that he was aware of his guilt.  If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance.  However, evidence of such an attempt cannot prove guilt by itself."

The failure to object to an instruction in the trial court forfeits the claim on appeal. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1260.)  Pena's counsel did not object to the proposed instruction and, in fact, specifically approved the instruction as modified.  Accordingly, he has forfeited this issue on appeal.

Defendant argues that if defense counsel's failure to object to the proposed instruction in the trial court forfeited review of this issue, then defense counsel provided ineffective assistance of counsel.  As explained above, "[w]hen a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation.  [Citation.]" (*People v. Anderson, supra,* 25 Cal.4th at p. 569.)  Such a claim is more appropriately resolved in a habeas corpus proceeding. (*People v. Mendoza Tello, supra,* 15 Cal.4th at pp. 266-267.)  The record on appeal does not reveal

---

**13**      Unmodified, "Version A—suppression" of CALCRIM No. 371 provides:
"[If the defendant tried to hide evidence or discourage someone from testifying against (him/her), that conduct may show that (he/she) was aware of (his/her) guilt.  If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance.  However, evidence of such an attempt cannot prove guilt by itself.]"

34

the reason defense counsel failed to object to the proposed instruction. Defense counsel may have concluded that the instruction was appropriate because there was substantial evidence that Pena attempted to hide his "187" tattoo from Detective Hahn during Pena's interview. Or, defense counsel may have concluded that the instruction was beneficial to the defense because it required the jury to first conclude there was an "attempt" to hide evidence before drawing any inferences. Only the number "7" was covered up. Pena did not correct the detective that the number was "18"—which might reflect his affiliation with the 18th Street gang. Any claim of ineffective assistance of counsel with respect to the claimed deficiency is better suited to a petition for writ of habeas corpus. (*People v. Anderson, supra,* 25 Cal.4th at p. 569; *People v. Mendoza Tello, supra,* 15 Cal.4th at p. 267.)

## VIII. Luna's Sentence Was Not Cruel or Unusual Punishment

Luna filed a motion in the trial court to reduce his conviction from first degree murder to voluntary manslaughter, arguing that a sentence of 25 years to life would constitute cruel and unusual punishment. The trial court denied the motion and imposed a sentence of 25 years to life. Luna contends that the trial court abused its discretion in denying his motion or, alternatively, in failing to reduce his conviction to second degree murder. He claims that his sentence was cruel and unusual punishment in violation of the California Constitution because he was 15 years old at the time of the murder, he had no criminal history, and he was not the shooter.[14] Luna's sentence was not cruel or unusual.

The California Constitution prohibits the imposition of cruel or unusual punishment. (Cal. Const., art. I, § 17.) A sentence is cruel or unusual when it is "so disproportionate to the crime for which it is inflicted that it shocks the conscience and

[14] A sentence is invalid under the California Constitution if it constitutes cruel *or* unusual punishment (Cal. Const., art. I, § 17) and is invalid under the United States Constitution if it is cruel *and* unusual (U.S. Const., 8th amend.). Although Luna characterizes his argument in the conjunctive—cruel *and* unusual—we will analyze it in the disjunctive—cruel *or* unusual—as the argument is made solely under the California Constitution.

offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424, fn. omitted (*Lynch*).) Successful challenges to the proportionality of particular sentences have been very rare. (*People v. Weddle* (1991) 1 Cal.App.4th 1190, 1196 ["Findings of disproportionality have occurred with exquisite rarity in the case law"].)

The California Supreme Court has instructed that, when reviewing a claim of cruel or unusual punishment, courts should examine (1) the nature of the offense and offender, (2) compare the punishment with the penalty for more serious crimes in the same jurisdiction, and (3) measure the punishment to the penalty for the same offense in different jurisdictions. (*Lynch, supra,* 8 Cal.3d at pp. 425-427, 431, 436; *People v. Dennis* (1998) 17 Cal.4th 468, 511.) Any one of these three factors can be sufficient to demonstrate that a particular punishment is cruel or unusual. (*In re Nunez* (2009) 173 Cal.App.4th 709, 725, citing *People v. Dillon* (1983) 34 Cal.3d 441, 487, fn. 38.)

Luna makes his claim of disproportionality under the first factor in *Lynch, supra,* 8 Cal.3d at page 425—the nature of the offense and the offender. Regarding the nature of the offense and the offender, we evaluate the totality of the circumstances surrounding the commission of the current offense, including the defendant's motive, the manner of commission of the crime, the extent of the defendant's involvement, the consequences of his acts, and his individual culpability, including factors such as the defendant's age, prior criminality, personal characteristics, and state of mind. (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1510.) Notwithstanding the factors identified in *Lynch*, "[t]he sole test remains . . . whether the punishment 'shocks the conscience and offends fundamental notions of human dignity.' (*Lynch*, 8 Cal.3d at p. 424.)" (*People v. Dillon, supra,* 34 Cal.3d at p. 441, fn. 38.)

The nature of the offense and the offender in this case are sufficient to justify the 25 years to life sentence the trial court imposed on Luna. The evidence adduced at trial showed that Luna was an active and callous participant in Peralta's premeditated murder. At Silvia's house, after returning from the trip to purchase .45-caliber bullets, Luna pulled a .45-caliber gun from his waistband area and loaded its clip with the bullets. After loading the clip, Luna gave the clip to Pena who put the clip in the gun and put the

gun "on his waist." Later that night, Augustin called Pena and said, on speaker, "Hey come over here, [Peralta] is over here. Come handle some shit." Augustin told Pena to "bring the .45 to see if it works." Pena agreed, and he and Luna went to the Maravilla party. Thus, Luna knew that Augustin had summoned Pena to the Maravilla party because Peralta was there, and Pena was armed, at Augustin's instruction, with a .45-caliber gun so that he could "handle some shit."

From the Maravilla party, Luna called Jimenez's phone. Silvia answered Jimenez's phone and put the call on speaker. Luna was heard laughing with Augustin and Pena. During that call, Peralta was heard begging Pena to not do anything because he was his "brother" and his "homie." Peralta also told Pena that he loved him. Pena said, "Fuck that," and Luna said, "Do this nigga." Pena then shot Peralta. Thereafter, Silvia heard Pena tell Luna to slow down because he was driving too fast—indicating that Luna was driving the getaway car. Although Luna was not the shooter, he was 15 years old at the time of the murder, and he had no criminal record, his sentence of 25 years to life does not shock the conscience and offend fundamental notions of human dignity. (*Lynch*, 8 Cal.3d at p. 424; *People v. Gonzales* (2001) 87 Cal.App.4th 1, 17 ["While Jimenez's youth [14 years old] and incidental criminal history are factors in his favor, they are substantially outweighed by the seriousness of the crime [first degree murder] and the circumstances surrounding its commission . . . . The lack of a significant prior criminal record is not determinative in a cruel and unusual punishment analysis. [Citation.]"].) This is not one of those rare cases in which a defendant's sentence should be reduced as cruel or unusual. (*People v. Weddle, supra,* 1 Cal.App.4th at p. 1196.)

## IX.  Pena's Custody Credit

Pena contends that the trial court erred in awarding him one too few days of custody credit. Respondent agrees as do we.

The trial court awarded Pena 427 days of actual custody credit. Under section 2900.5, a defendant convicted of murder is entitled to credit for actual days spent in custody from the date of arrest to the date of sentencing. (*People v. Taylor* (2004) 119

Cal.App.4th 628, 645.) Pena was arrested on August 16, 2011, and sentenced on October 16, 2012, a period of 428 days. Because the trial court erred in awarding Pena 427 days of actual custody credit, we order the abstract of judgment modified to reflect 428 of actual custody credit.

## DISPOSITION

Luna's judgment is affirmed. Pena's abstract of judgment is ordered modified to reflect an award of 428 days of actual custody credit. Pena's judgment is otherwise affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


MOSK, J.

We concur:


TURNER, P. J.


MINK, J.*

---

\*      Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.